# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2360 |
| COMPLETE TITLE: | Dennis A. Teague,<br>            Plaintiff-Appellant-Petitioner,<br>Linda Colvin and Curtis Williams,<br>            Intervening<br>            Plaintiffs-Appellants-Petitioners,<br>      v.<br>Brad D. Schimel, Walt Neverman, Dennis Fortunato<br>and Brian O'Keefe,<br>            Defendants-Respondents. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 367 Wis. 2d 547, 877 N.W.2d 379
PDC No: 2016 WI App 20 - Published

| | |
|---|---|
| OPINION FILED: | June 8, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 9, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Juan B. Colas |

| | |
|---|---|
| JUSTICES: | |
| SEPARATE WRITING: | ABRAHAMSON, J. writes separately, joined by A.W. BRADLEY, J. |
| CONCURRED: | GABLEMAN, J. concurs, joined by ROGGENSACK, C.J. |
| DISSENTED: | ZIEGLER, J. dissents |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiffs-appellants-petitioners, there were briefs by *Jeffery R. Myer, Sheila Sullivan*, and *Legal Action of Wisconsin, Inc.,* Milwaukee, and an oral argument by *Jeffery R. Myer.*

For the defendants-respondents, there was a brief filed by and an oral argument by *Daniel P. Lennington*, deputy solicitor general, with whom on the brief was *Misha Tseytlin*, solicitor general, and *Brad D. Schimel,* attorney general.

No. 2014AP2360
(L.C. No. 2010CV2306)

STATE OF WISCONSIN          :          IN SUPREME COURT

Dennis A. Teague,

      Plaintiff-Appellant-Petitioner,

Linda Colvin and Curtis Williams,

      Intervening

      Plaintiffs-Appellants-Petitioners,

   v.

Brad D. Schimel, Walt Neverman, Dennis Fortunato and Brian O'Keefe,

      Defendants-Respondents.

**NOTICE**

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUN 8, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1   DANIEL KELLY, J.   The Wisconsin Department of Justice ("DOJ") has a policy and practice of creating and disseminating criminal history reports in a manner that, at times, indicates that some individuals who are wholly innocent of any criminal activity have a criminal history. The DOJ is aware its policy and practice can have this effect. There is, however, no

procedure by which an affected individual can stop the creation and dissemination of these reports. Petitioners say this occurs because the DOJ does not, before releasing the reports, balance the public's interest in disclosure against the public interest in nondisclosure.[1] They also say the DOJ refuses to correct its records pursuant to Wis. Stat. § 19.70 (2015-16),[2] which results in the deprivation of their constitutionally-protected due process rights, as well as their right to the equal protection of the laws.[3]

## I. Background

### A. The DOJ Database

¶2 The DOJ maintains a massive, and growing, centralized criminal history database that contains and tracks information about people who have come into contact with Wisconsin's criminal justice system (the "Database"). According to the DOJ's website, the Database "contains detailed information of arrests, arrest charges, prosecution, court findings, sentences,

---

[1] See Wis. Newspress, Inc. v. Sch. Dist. of Sheboygan Falls, 199 Wis. 2d 768, 786-88, 546 N.W.2d 143 (1996).

[2] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

[3] This is a review of a published decision of the court of appeals, Teague v. Van Hollen, 2016 WI App 20, 367 Wis. 2d 379, 877 N.W.2d 379, affirming the circuit court's dismissal of all of Mr. Teague's claims, the Honorable Juan B. Colás presiding.

and state correctional system admissions and releases."[4] The Database "is an accumulation of information submitted by Wisconsin law enforcement agencies, prosecutors, courts, and the Wisconsin Department of Corrections as required by applicable statutes." The DOJ has a statutory mandate to gather, store, and curate this information: "[The DOJ] shall: (a) Obtain and file fingerprints, descriptions, photographs and any other available identifying data on persons who have been arrested or taken into custody in this state . . . ." Wis. Stat. § 165.83(2).

¶3 As of July 11, 2016, the Database contained criminal records on almost 1.5 million people. Each record is keyed to an individual's fingerprint. The record also contains a "master name," which is the name the person gave upon his or her first contact with the criminal justice system. Any name thereafter associated with that person is listed as an alias on the record. The record may also contain a picture of the individual, a physical description, any birth dates supplied by the subject, and known residences. We will refer to all the information associated with a record as the "Personal Information."

¶4 The Database has many uses critical to the security of Wisconsin's residents, one of which is assisting members of the public in discovering whether a given individual has a criminal

---

[4] *Background Check & Criminal History Information*, Wisconsin Department of Justice (last accessed May 25, 2017), https://www.doj.state.wi.us/dles/cib/background-check-criminal-history-information.

history.    Such  knowledge  can  be  valuable  to,  for  example,
employers,  organizations  serving  children  (or  other  vulnerable
populations),  landlords,  and  others.[5]    To  determine  whether  an
individual  has  such  a  history,  a  person  submits  a  request  for  a
criminal  history  record  search  to  the  DOJ,  which  can  be  done  by
mail  or  online  through  the  Wisconsin  Online  Record  Check  System
("WORCS").

¶5    The  DOJ's  records  system  can  perform  two  types  of
searches  for  criminal  histories.    The  first  is  fingerprint-based
and  requires  submission  of  a  full  set  of  fingerprints  for  the
subject  in  whom  the  requester  is  interested.    The  second  type  is
name-based  and  requires  only  the  subject's  first  and  last  name
and  date  of  birth  (although  additional  Personal  Information  can
be  submitted  as  well).    The  DOJ's  website  describes  name-based
searches  as  "quicker,  cheaper,  and  easier  than  fingerprint-based
searches  . . . ."[6]

---

[5] There  are,  of  course,  limitations  on  how  one  may  use
knowledge  of  a  person's  criminal  history.  See, e.g., Wis. Stat.
§ 111.31 (declaring  the  general  policy  of  the  state  to  prohibit
discrimination  based  upon  many  different  factors  including  a
person's  arrest  or  conviction  record);  Wis. Admin. Code NR
§ 51.968(2) (2017) (stating  that  counties  receiving  grants  to
acquire  property  "may  not  discriminate  against  any  person  in  the
use  and  enjoyment  of  the  property  on  the  basis
of . . . conviction  record,  arrest  record . . . .");  Wis. Admin.
Code Adm § 2.04 (prohibiting  discrimination  against  persons  with
conviction  or  arrest  records  when  using  state  office  buildings
and  facilities  for  government  business,  public  meetings,  or
civic  activities).

[6] Background  Check  &  Criminal  History  Information  (last
accessed  May  25,  2017),  https://www.doj.state.wi.us/dles/
cib/background-check-criminal-history-information.

¶6 Although a person may request a criminal history check online, the process is not entirely automated. The DOJ's computer system compares the information provided by the requester against the nearly 1.5 million records in the Database. With respect to name-based searches, the system employs a sophisticated algorithm to score how closely the provided information relates to the records in the Database. If the score falls below a certain threshold, the DOJ sends the requester a "no record" response, indicating the Database contains no information about the subject of the inquiry. If the score is sufficiently high, the identified records are automatically sent to the requester. If the score falls in between, then one of nineteen DOJ employees must make a judgment as to whether the search has identified information potentially responsive to the request. We will refer to the DOJ's named-based record search process as the "Criminal History Search."

¶7 The information the DOJ provides to the requester in response to a Criminal History Search request is unreliable, something the DOJ readily admits. Its website warns that "[b]ecause name-based searches are based on non-unique identifying data, such as name and date of birth, they are less reliable than fingerprint-based checks." In the webpage entitled "Background Check & Criminal History Information," the DOJ acknowledges that "[i]n some cases, a name-based check may pull up a

criminal record that does not belong to the subject of the search."

¶8 The WORCS training material also notes the unreliability of a Criminal History Search. Part of that material illustrates how to request a Criminal History Search with a series of captured screen images. Towards the end of a typical transaction, after the person has entered information related to the subject and paid the required fee, a screen appears with certain disclaimers displayed in a small font, amongst which is the following:

Printed below these explanations is a Wisconsin arrest record that has been identified as a possible match to the identifying data you provided.

A [sic] arrest search based only on name, date of birth, and other identifying data that is not unique to a particular person (like "sex" or "race") may result in:

1. Identification of arrest records for multiple persons as potential matches for the identifying data submitted, or

2. Identification of a [sic] arrest record belonging to a person whose identifying information is similar in some way to the identifying data that was submitted to be searched, but is not the same person whose identifying data was submitted for searching.

The Crime Information Bureau (CIB) therefore cannot guarantee that the arrest record below pertains to the person in whom you are interested.

* * *

The arrest reported below is linked by fingerprints to the name appearing directly after these explanatory sections, following the label "IDENTIFICATION." That

name is the name that was provided by the fingerprinted person the first time his or her fingerprints were submitted to CIB; it may or may not be the real name of the fingerprinted person.  That name is called the "Master Name" in these explanatory sections.[7]

¶9   The DOJ's instructions on how to read a criminal record also testify to the unreliability of the information returned by the search.[8]  They admonish the requester "not just [to] assume that a criminal history record pertains to the person whose identifying information was submitted to be searched," and encourage the requester to "carefully read the entire Wisconsin criminal history record response in order to determine whether the record returned pertains to the person whose identifying information was submitted to be searched."  The instructions additionally state that if the subject's name is different from the "Master Name" on the record, then the record "may belong to someone other than the person whose name and other identifying data you submitted for searching."  The instructions also say that even if the name submitted is the

---

[7] The training material contains commentary on this step of the transaction:  "User checks the box on the legalese modal to agree with the terms after the request is complete."  As Dr. Sam Racine (one of petitioners' experts) testified, this likely receives about as much attention as most "legalese" standing between the user and his purchase:  "There's clearly a block of information that is probably some kind of disclaimer.  I'm going to flip through that.  I'm going to flip very quickly because I want to get to the information that matters to me which is what's in this criminal report."

[8] Instructions on how to read a criminal record and a notice to employers appear on a cover page accompanying each search response generated and returned to requesters.

same as the "Master Name" on the record, the response "may belong to someone other than the person whose name and other identifying data you submitted for searching," because the "'Master Name' is the name attached to the initial fingerprint submission to [the Crime Information Bureau] that is associated with the reported criminal history, and may have been an alias name."

¶10 Notwithstanding the oft-noted unreliability of Criminal History Search requests, the DOJ receives over 900,000 such requests a year from individuals and organizations outside the law enforcement community.

### B.  The Petitioners

¶11  This case is not, however, about any of the nearly 1.5 million people in the DOJ's Database.  It is about those who are not.  Most immediately, it is about Dennis A. Teague and two others who the Database and its algorithm suggest may have criminal histories.  Happily, they do not.  Unhappily, they have been unable to get the DOJ's Criminal History Search to stop indicating otherwise.

¶12  Mr. Teague's difficulties started when his cousin (an individual to whom we will refer as "ATP") stole his identity (according to Mr. Teague).[9]  As a result, the name "Dennis Antonio Teague" was added to ATP's record in the Database as an

---

[9] We refer to ATP by his initials, and understand his stealing as "alleged," because he apparently has not had an opportunity to contest any representations made about him by the parties to this case.

8

alias.  Since that time, anyone using Mr. Teague's name and birthdate to request a Criminal History Search will receive ATP's criminal history report in response.  And this occurs even though the birthdate ATP gave for his "Dennis Antonio Teague" alias is different from Mr. Teague's.

¶13  The DOJ recognizes the entirely predictable adverse consequences that come from giving a requester a criminal history report belonging to someone other than the subject of the search.  To address this problem, at least in part, the DOJ created a procedure by which individuals may petition for an "innocence letter."  To obtain such a letter, a person must submit to the DOJ a challenge form and fingerprint card.[10]  The DOJ then performs a fingerprint-based search of the Database and, if no matching records exist, it issues to the individual a notarized letter stating that he had no criminal history as of the date of the letter.[11]  Mr. Teague, and more than 400 other

---

[10] Wisconsin Criminal History Challenge, Wisconsin Department of Justice (June 2014), https://www.doj.state.wi.us/sites/default/files/dles/cib-forms/ record-check-unit/DJ-LE-247-fw.pdf.

[11] The DOJ website says it will provide further protections in the future for people like Mr. Teague:

> The Wisconsin Department of Justice will be implementing the use of a Wisconsin Unique Personal Identification Number (WiUPIN) that will be assigned to individuals that have successfully challenged a criminal history record existing in the Wisconsin Criminal History Database.  Once implemented, the WiUPIN would be included in the search data provided by a requestor and used in searching potential matching records, so that any arrest and/or conviction

(continued)

9

people, have received such innocence letters to assist in ameliorating the harmful effects of the information disseminated by the DOJ.

¶14 Having successfully established that he is not a criminal, Mr. Teague may provide the innocence letter to potential employers, landlords, or others who he has reason to believe may have requested a Criminal History Search. The letters, of course, will grow stale over time. Every time the actual criminal causes a new entry on the record in the Database, people like Mr. Teague will once again have to establish their innocence by submitting another challenge form and set of fingerprints. There appears to be no mechanism, however, by which an innocent person can know when his criminal doppelgänger does something to make his letter moot. So Mr. Teague may learn his letter has lost its effectiveness through, for example, a denied housing application, a job offer that never comes, or the denial of any of a number of rights or opportunities provided or protected by statute.

¶15 The DOJ's current practice is to place the onus for distributing the innocence letters entirely on the innocent person. Although the DOJ creates and maintains the letters, it does not include them when producing criminal histories

record successfully challenged would not be included in a public response.

Background Check & Criminal History Information, Wisconsin Department of Justice, https://www.doj.state.wi.us/dles/cib/background-check-criminal-history-information.

implicating the subjects of those letters.[12] Thus, when someone requests a criminal background check on Mr. Teague, the DOJ will provide ATP's criminal history (with Mr. Teague's name listed as an alias), but not the innocence letter.

## II. Procedural History

¶16 Mr. Teague's complaint[13] alleged that DOJ officials: (I) Failed to properly source and verify information about a record subject in violation of Wis. Stat. § 19.67; (II) Disseminated information about him without first conducting the common-law balancing test; (III) Failed to correct inaccuracies in the information provided to requesters pursuant to Wis. Stat. § 19.365 (now § 19.70); (IV) Violated his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 1, § 1 of the Wisconsin

---

[12] In a recent development, the DOJ now adds the following language (printed in red) to its standard set of disclaimers when a person has been issued an innocence letter:

****RESPONSE CAVEAT****

The Wisconsin Department of Justice has received a successful fingerprint based challenge to this record from an individual whose name is similar to the record or whose identity was stolen and used during an arrest. Please ensure the identity of your applicant to determine if they are the subject of this record or an individual whose name is similar or whose identity was stolen. If you have any questions regarding this challenge process, please contact the Criminal History Unit of the Crime Information Bureau . . . .

[13] Linda Colvin and Curtis Williams intervened in the action after Mr. Teague filed his complaint. They each present factual circumstances that, as relevant here, are indistinguishable from each other. Consequently, our references to Mr. Teague encompass all the petitioners.

11

Constitution; (V) Violated his substantive due process rights under the Fourteenth Amendment to the United States Constitution and Article 1, § 1 of the Wisconsin Constitution; and (VI) Violated his procedural due process rights.

¶17 The parties filed opposing motions for summary judgment, following which the circuit court dismissed claims I through IV. The circuit court conducted a bench trial on the substantive and procedural due process claims (V & VI), after which it dismissed the remainder of the complaint.

¶18 Mr. Teague appealed the judgment of the circuit court, but presented arguments on only Claims II through VI. The court of appeals, in a published decision, affirmed the circuit court.[14] In doing so, it determined that Wis. Stat. § 19.356(1) prevents judicial review of the DOJ's provision of ATP's criminal history in response to a request for a Criminal History Search on Mr. Teague. The Petitioners timely sought review, and we now reverse.

### III. STANDARD OF REVIEW

¶19 The proper application of a statute to undisputed facts generally presents a question of law. Pawlowski v. Am. Family Mut. Ins. Co., 2009 WI 105, ¶16, 322 Wis. 2d 21, 777 N.W.2d 67. We review such questions independently of the circuit court and court of appeals, although we benefit from their analyses. Id. Procedural due process challenges present

---

[14] Teague, 367 Wis. 2d 547.

12

a question of law, which we review de novo.  <u>In re Commitment of</u>
<u>Sorenson</u>, 2002 WI 78, ¶25, 254 Wis. 2d 54, 646 N.W.2d 354.

IV.   ANALYSIS

¶20  Petitioners assert that Wis. Stat. § 19.70 requires
the DOJ to correct or supplement its record production when it
inaccurately ascribes a criminal history to an innocent person.
Failure to correct or supplement, they say, violates their right
to procedural and substantive due process, as well as their
right to the equal protection of the laws.[15]  We address the
statutory claim first.

A.   Duty to Correct or Supplement

¶21  The subject of a public record containing personally
identifiable information may, upon discovering an inaccuracy in
that record, engage a statutory mechanism to have it corrected.
The procedure for doing so is as follows:

> (1)  Except as provided under sub. (2),[16] an
>      individual or person authorized by the individual
>      may challenge the accuracy of a record containing
>      personally identifiable information pertaining to
>      the individual that is maintained by an authority
>      if the individual is authorized to inspect the

---

[15] Petitioners also ask us to conclude that, with respect to each Criminal History Search request, the DOJ must balance the public's interest in disclosure of responsive material against the public's interest in non-disclosure.  The DOJ argues that the policy it adopted on how to respond to such requests satisfies the common-law balancing requirement, and so it need not perform a separate evaluation each time it receives a background check request.  We need not reach this question because of how we resolve this case.

[16] The exceptions do not apply to the records in question.

13

record under s. 19.35 (1) (a) or (am) and the individual notifies the authority, in writing, of the challenge.  After receiving the notice, the authority shall do one of the following:

(a) Concur with the challenge and correct the information.

(b) Deny the challenge, notify the individual or person authorized by the individual of the denial and allow the individual or person authorized by the individual to file a concise statement setting forth the reasons for the individual's disagreement with the disputed portion of the record.  A state authority that denies a challenge shall also notify the individual or person authorized by the individual of the reasons for the denial.

Wis. Stat. § 19.70.[17]

### 1.    Mr. Teague's requested correction

¶22  Mr. Teague wants the DOJ to correct its records, but has not been entirely clear about what form that correction ought to take.  After obtaining his innocence letter, he wrote to the DOJ demanding relief under Wis. Stat. § 19.70 (then, Wis. Stat. § 19.365).  According to the DOJ letter annexed to the complaint, Mr. Teague had asked the DOJ to remove his name as an alias from the record in the Database containing ATP's criminal history (as distinct from the record created pursuant to a Criminal History Search request).

---

[17] "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning."  State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.

14

¶23 The body of Mr. Teague's complaint does not clarify what it is he believes needs to be corrected. It alleges the DOJ "has failed to correct the information identified with Dennis A. Teague," but says nothing about what, precisely, needed correction. The complaint's ad damnum clause demands, in relevant part: (1) a declaration that the DOJ knowingly failed to correct information about Mr. Teague before disseminating it; and (2) an order enjoining the DOJ from its continuing violation of its duty to correct its records. The complaint does not indicate whether Mr. Teague still believes the DOJ should remove his name from ATP's Database record.

¶24 In his opening brief here, Mr. Teague appears to modify the correction he is seeking. He says the DOJ can satisfy its obligation to correct the record by (1) not sending ATP's criminal history when someone requests a Criminal History Search on Mr. Teague, or (2) including his innocence letter with any information the DOJ produces in response to a request for a Criminal History Search on Mr. Teague. The brief also acknowledges that he "is not challenging the database or how DOJ keeps records; he challenges the correctness of the report made in response to a request for a criminal history report about him." In his reply brief, Mr. Teague asserts that "[t]he 'record' in § 19.70 is the report, not the database." He then appears to concede that the Database itself is accurate, making his original correction demand moot: "The electronic blips of the database can be accurate because NOT associated with Teague's identifiers, but the report, which makes the

15

association, is inaccurate when printed with Teague's name . . . ." Having thus identified the report as the record in need of correction, as opposed to the information in the Database, he says the DOJ can fulfill its statutory duty to correct or supplement the record by: "(a) correct[ing] the record (the report) by breaking the association to Teague's personal identifiers, or (b) deny[ing] the challenge, inform[ing] the challenger, and allow[ing] supplementation with a 'concise statement setting forth the reasons for the individual's (Teague's) disagreement with the record (the report).'"

¶25 In our view, Mr. Teague has waived his initial demand that the DOJ remove his name from the Database's record of ATP's criminal history. That specific request for relief is only suggested in an exhibit to the complaint and appears nowhere in the briefing before this court.[18] The following analysis, therefore, assumes Mr. Teague is arguing that the record at issue in this case is the report created in response to a request for a Criminal History Search, and that the DOJ has a duty under Wis. Stat. § 19.70(1) to correct or supplement it.

2.    Applicability of Wis. Stat. § 19.70

¶26 The threshold question is whether the report containing ATP's criminal history is a "record" subject to

---

[18] We will not resolve an issue where the issue "has not been adequately briefed, and the facts have not been adequately developed to allow us to make a reasoned determination." Shannon v. Shannon, 150 Wis. 2d 434, 446, 442 N.W.2d 25 (1989).

correction pursuant to the terms of Wis. Stat. § 19.70 when produced in response to a request for a Criminal History Search on Mr. Teague. Our statutes say a "record" is "any material on which written, drawn, printed, spoken, visual, or electromagnetic information or electronically generated or stored data is recorded or preserved, regardless of physical form or characteristics, that has been created or is being kept by an authority." Wis. Stat. § 19.32(2) (emphasis added). An "authority" is "any of the following having custody of a record: a state or local . . . department . . . ." Wis. Stat. § 19.32(1).

¶27 Depending on how the requester submitted the request for a Criminal History Search, the response will be either "written" material or "electronically generated" information. Either way, the report is created by the DOJ, which is an "authority." And the report was in the DOJ's custody, at least until forwarded to the requester. Thus, ATP's criminal history report is a record.

¶28 Mr. Teague may therefore challenge the accuracy of the report if it "contain[s] personally identifiable information pertaining to [him] that is maintained by an authority if the individual is authorized to inspect the record under s. 19.35 (1) (a) or (am) . . . ." Wis. Stat. § 19.70(1). The DOJ maintains the information in the report, and Mr. Teague may inspect it as readily as those requesting the Criminal History

17

Searches,[19] so the only real question is whether the report contains "personally identifiable information" pertaining to Mr. Teague. A name is a piece of personally identifiable information. Wis. Stat. § 19.62(5) ("'Personally identifiable information' means information that can be associated with a particular individual through one or more identifiers or other information or circumstances."). Thus, because the report lists Mr. Teague's name as an alias, it contains personally identifiable information pertaining to him.

¶29 If there were any doubt about this conclusion, the DOJ's own actions, if not its arguments, would remove it. The DOJ says ATP's criminal history report does not fall within the purview of Wis. Stat. § 19.70 because, even though it acknowledges the record contains Mr. Teague's name, "the record itself does not 'pertain' to Teague." That, of course, is not the standard. Section 19.70 merely requires that the record "contain" personally identifiable information pertaining to him. The entire record need not do so. Even if the entire record must pertain to Mr. Teague, the DOJ's actions demonstrate that it believes it does. This case exists only because, in providing ATP's record of criminal activity to someone requesting a Criminal History Search on Mr. Teague, the DOJ

---

[19] "Except as otherwise provided by law, any requester has a right to inspect any record." Wis. Stat. § 19.35(1)(a).

thought it was producing a record pertaining to Mr. Teague.[20] And that, as we describe below, is ultimately what makes the report inaccurate.

### 3. Inaccuracy of the Report

¶30 The DOJ says there is nothing to correct because the report it produces when a person requests a Criminal History Search on Mr. Teague is perfectly accurate: "[A] search for the name of 'Dennis Antonio Teague' along with a date of birth will accurately return a criminal record associated with that name." It also asserts that "DOJ's report is an accurate reflection of what information DOJ matched to the information provided by a requester." This is all true, as far as it goes. But it does not go far enough to account for the relationship between what a requester seeks when asking for a Criminal History Search, and the information the DOJ produces in response.

¶31 The DOJ misunderstands the question asked by someone requesting a Criminal History Search. It says "[r]equesters are getting exactly what they search for: they are asking whether any criminal records match the information they have." But that is not what requesters are asking. The DOJ's characterization suggests a merely idle curiosity about whether a specific name happens to appear in the Database. What they

---

[20] It is possible, given the DOJ's many disclaimers, that it thought ATP's criminal history might pertain to Mr. Teague, but was not sure. Whatever the level of its metaphysical certainty on the question, when it came time to translate beliefs into action it resolved its doubts in favor of pertinence.

are actually asking is whether the people whose names they submit have criminal histories.

¶32  The DOJ must know this is what requesters are asking. Its own website, forms, and disclaimers indicate they do.  For example, the WORCS website says it "is designed for individuals or organizations to submit criminal background checks and retrieve results online."[21]  To request a criminal background check by mail, one fills out a form entitled "Wisconsin Criminal History Single Name Record Request."  Wisconsin Criminal History Single Name Record Request, Wisconsin Department of Justice (July 2011), https://www.doj.state.wi.us/sites/default/files/ dles/cib-forms/record-check-unit/DJ-LE-250-single.pdf.  The "General Instructions" attached to that form say Wisconsin's statutes "provide that any person or entity may request a criminal background check."  Id. (emphasis added).  They further say one should "[u]se form DJ-LE-250 to request a criminal background check on a single individual" and "form DJ-LE-250A to request background checks on multiple persons."  Id. (emphases added).  The requesters are, indubitably, asking whether the identified individuals have criminal backgrounds; they are not making abstract inquiries into whether the DOJ's "criminal records match the information they have."

---

[21] Wisconsin Online Record Check System, Wisconsin Department of Justice (last accessed May 25, 2017), https://recordcheck.doj.wi.gov/ (emphasis added).

¶33 If the DOJ's characterization of the requesters' inquiries were correct, none of its many disclaimers would be needed. The DOJ advises requesters not to "assume that a criminal history record pertains to the person whose identifying information was submitted to be searched." Background Check & Criminal History Information, Wisconsin Department of Justice (last accessed May 25, 2017), https://www.doj.state.wi.us/dles/cib/background-check-criminal-history-information. And it further advises that the record it produces "may belong to someone other than the person whose name and other identifying data you submitted for searching." Id. The website says the DOJ "cannot guarantee that the information furnished pertains to the individual you are interested in." And "[i]n some cases, a name-based check may pull up a criminal record that does not belong to the subject of the search." Id. None of this would be necessary if requesters were simply asking whether the information they submitted appears in the Database. But if the question is whether the identified individual has a criminal history, then these disclaimers make sense because the DOJ knows the information it produces might not relate to that person.

¶34 In this case, the DOJ has known ATP's criminal history report does not relate to Mr. Teague ever since it issued Mr. Teague's innocence letter. It necessarily follows that, by continuing to produce that report in response to an inquiry into whether Mr. Teague has a criminal history, it is providing inaccurate information. The DOJ's briefing admits as much,

21

stating that "[t]he record DOJ returns in response to a search for 'Dennis Teague' is a report that contains the name as an alias for ATP, but the record itself does not 'pertain[]' to Teague."  Indeed, it does not.  And because it does not, providing ATP's criminal history in response to a Criminal History Search on Mr. Teague makes the report an inaccurate record by the DOJ's own admission.

¶35 It is not the information in ATP's criminal history report, however, that is inaccurate.  The inaccuracy arises when the DOJ provides that report to someone asking whether Mr. Teague has a criminal history.  It is the DOJ itself that is affirmatively creating the inaccuracy, and Mr. Teague has successfully demonstrated that Wis. Stat. § 19.70 entitles him to have this inaccuracy corrected.  Because the genesis of the inaccuracy is the DOJ's provision of the record to the requester, corrections under § 19.70 will likely never have anything more than a retroactive effect.  Consequently, we next address whether the DOJ's policy and practice violate Mr. Teague's due process rights, which holds out the possibility of prospective relief.[22]

---

[22] Justice Gableman would not address the due process claim because he believes Wis. Stat. § 19.70 creates not just a remedy for correcting inaccurate records, but an affirmative obligation to not create inaccuracies in the first place:

> Complying with § 19.70(1)(a) requires "correct[ing] the information," and in Teague's case, DOJ is providing inaccurate information by incorrectly presenting ATP's criminal history as Teague's when, in fact, DOJ knows that Teague has no criminal history. Merely retracting a single report amounts to no

(continued)

correction at all, because the database will continue to generate the same report with the same inaccuracies. Therefore, under the facts here——where DOJ knows its database is repeatedly producing the same inaccuracy——I conclude that "correct[ing] the information" under § 19.70(1)(a) requires ensuring that ATP's criminal history will no longer be inaccurately reported as Teague's.

Justice Gableman's concurrence, ¶139.

The problem with this solution is that § 19.70 does not forbid the creation of inaccurate records——it requires only that the agency correct inaccuracies previously created, a remedy that is wholly retrospective. It's not just the terms of the statute that say so, its entire structure forecloses the relief Justice Gableman would supply. The statute has nothing to say to an agency that is thinking about creating an inaccuracy, or is even in the process of creating an inaccuracy. The statute does not come into play until an aggrieved individual identifies an inaccuracy and demands its correction. That, of course, means the statute focuses exclusively on something the agency had already done. Past perfect tense. It is enough that the statute has purchase only on errors that have already occurred to rule out Justice Gableman's proposal; the actual remedy portion of the statute, however, makes this limitation unmistakable. Upon demonstration that a record is inaccurate, the agency's sole statutory obligation is to correct it. One cannot correct what has not yet happened, so the statutory language cannot support Justice Gableman's proposition that we order the DOJ to prospectively "ensure that ATP's criminal history will no longer be inaccurately reported as Teague's."

(continued)

23

B.    Procedural Due Process

¶36 Mr. Teague says the DOJ deprives him of his right to due process of law when it provides ATP's criminal history report in response to a Criminal History Search request on his name. The problem Mr. Teague identifies here is more than simply the inaccuracy the DOJ creates when it ascribes ATP's criminal history to him (however subject to caveats the ascription might be). It is that the DOJ has a policy and practice that it knows will predictably, consistently, and inaccurately suggest Mr. Teague has a criminal history, and there is no procedure by which he can stop this. Our constitutions, he argues, entitle him to at least some minimal quantum of process by which to contest the DOJ's policy and practice.

---

Thus, the only way this statute could have prospective effect is if the DOJ grew sufficiently weary of issuing retractions that it changed its reporting system to eliminate false positives. Failing that, Mr. Teague would have to engage the procedure Justice Gableman described: Contest the report under § 19.70, commence a chapter 227 review proceeding if the DOJ does not retract the report, initiate a circuit court lawsuit if the administrative review process does not provide relief, and continue on and on until he gets relief or his appellate options end. And he would have to pursue this onerous, expensive, time-consuming process every time the DOJ erroneously attributes ATP's criminal history to him. That is why the statutory remedy almost certainly has no prospective effect. It is also why we must proceed to Mr. Teague's constitutional claim, because (as Justice Gableman elegantly put it), "[m]erely retracting a single report amounts to no correction at all . . . ." Quod erat demonstrandum.

¶37 The United States Constitution provides, in relevant part, that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. We can trace the roots of the "due process" guarantee back to clause 39 of the Magna Carta, which proclaimed that "No free man is to be arrested, or imprisoned, or disseised, or outlawed, or exiled, or in any other way ruined, nor will we go against him or send against him, except by the lawful judgment of his peers or by the law of the land." It is from the phrase "law of the land" that we derive the "due process" obligation: "The words, 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in *Magna Carta*. Lord Coke, in his commentary on those words, says they mean due process of law." Murray's Lessee v. Hoboken Land & Imp. Co, 59 U.S. 272, 276 (1855) (citations omitted). We find the same in the Northwest Ordinance of 1787, which promises "[n]o man shall be deprived of his liberty or property, but by the judgment of his peers or the law of the land."[23] And we understand the Wisconsin Constitution as promising due process of law under this formulation: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness." Wis. Const. art. I, § 1; Blake v. Jossart, 2016 WI 57, ¶28, 370

---

[23] An Ordinance for the Government of the Territory of the United States north-west of the river Ohio as adapted by An Act to provide for the Government of the Territory North-west of the river Ohio, art. II, 1 Stat. 50, 52 (1789).

Wis. 2d 1, 884 N.W.2d 484, cert denied, 2017 WL 69276 (U.S. Jan. 9, 2017) (We "treat[] these provisions of the United States and Wisconsin Constitutions as consistent with each other in their due process and equal protection guarantees.").

¶38 Yet not all governmental enactments or policies are the "law of the land" within the meaning of this concept:

> [C]an a State make any thing due process of law which, by its own legislation, it chooses to declare such? To affirm this is to hold that the prohibition to the States is of no avail, or has no application where the invasion of private rights is effected under the forms of State legislation.

Davidson v. City of New Orleans, 96 U.S. 97, 102 (1877). It is not just legislative activity that is subject to due process/"law of the land" scrutiny. Executive and judicial functions must comport with that requirement as well. "The article [the due process clause] is a restraint on the legislative as well as on the executive and judicial powers of the government . . . ." Murray's Lessee, 59 U.S. at 276.

¶39 In its most basic sense, procedural due process is the requirement that the government provide notice and an opportunity to be heard when its actions will cause the loss of a protected interest. Simon v. Craft, 182 U.S. 427, 436 (1901) ("The essential elements of due process of law are notice and opportunity to defend."); Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be

26

preceded by notice and opportunity for hearing appropriate to the nature of the case.").

¶40 The focus here is on procedural safeguards, not on whether the State has the authority to take the action under review: "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." Zinermon v. Burch, 494 U.S. 113, 125 (1990). This constitutional guarantee protects an individual from the erroneous exercise of the State's authority. "Procedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978). "Such rules 'minimize substantively unfair or mistaken deprivations of' life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests." Id. at 259-60.

¶41 We use a two-step process in evaluating due process claims. First, we determine whether the claimant has identified an interest protected by the Due Process Clause (life, liberty, or property). Aicher v. Wis. Patients Comp. Fund, 2000 WI 98, ¶80, 237 Wis. 2d 99, 613 N.W.2d 849. Second, we consider whether the procedural safeguards (if any) adequately protect the identified interest. Id.

### 1.   Protected Interest

¶42 Mr. Teague has asserted an interest in his good name and reputation.  There is no doubt that these are assets of great value.  And it is a welcome commonplace that people typically conduct their lives in a manner calculated to preserve those interests.  Ascribing criminal activity to an innocent person, however, demeans those assets.  Indeed, it is so clearly injurious that doing so constitutes libel per se.  "This is elementary:  Any malicious publication, by printing or writing, or by signs or pictures, which accuses a person of a crime, blackens his character, or tends to expose him to public ridicule, contempt or hatred, is libelous . . . ."  Downer v. Tubbs, 152 Wis. 177, 180, 139 N.W. 820 (1913) (internal marks and citations omitted); Paul v. Davis, 424 U.S. 693, 697 (1976) ("Imputing criminal behavior to an individual is generally considered defamatory Per se, and actionable without proof of special damages."); Converters Equip. Corp. v. Condes Corp., 80 Wis. 2d 257, 263, 258 N.W.2d 712 (1977) ("A statement is also defamatory if, in its natural and ordinary sense, it imputes to the person charged commission of a criminal act."); Scofield v. Milwaukee Free Press, 126 Wis. 81, 87-88, 105 N.W. 227 (1905) ("Written words which subject plaintiff to disgrace or ridicule are actionable per se.").[24]

---

[24] The Restatement (Second) of Torts says that:

One who publishes a slander that imputes to another conduct constituting a criminal offense is subject to liability to the other without proof of special harm
(continued)

a.   Defamation

¶43 Every time the DOJ provides ATP's criminal history in response to a Criminal History Search on Mr. Teague, it is inaccurately suggesting that Mr. Teague has a criminal history when, in fact, he does not.  The impression this creates on the requester is open to debate.  It may be that he arrives at a definite conclusion that Mr. Teague has a criminal history.  Or he may simply presume that he does.  The only conclusion the report does <u>not</u> foster is the accurate one:  Mr. Teague has no criminal history.  Thus, when the DOJ provides ATP's criminal history to those inquiring into Mr. Teague's background, it necessarily raises the specter of criminality in the requester's mind.

¶44 A contrary conclusion would be unreasonable.  A requester seeks a background check from the DOJ because he believes he will receive useful information in response.[25]  When he receives ATP's criminal history, listing Mr. Teague's name as an alias, there is nothing in the package that tells him the

if  the  offense  imputed  is  of  a  type  which,  if committed in the place of publication, would be

(a)  punishable  by  imprisonment  in  a  state  or  federal institution . . . .

Restatement (Second) of Torts, § 571 (Am. Law Inst. 1977).

[25] If it were otherwise, it would be unlikely the DOJ would receive 900,000 background requests each year.  It would be irrational to spend the time and money on such requests unless the requester assumed the DOJ would provide information related to the subject of the request.

crimes were <u>not</u> committed by Mr. Teague.  According to the DOJ, one cannot even tell from the report whether ATP is an alias used by Mr. Teague, or if Dennis Teague is an alias used by ATP.[26]  Nor is there anything in the report to suggest they are two different people.  So unless the requester knows Mr. Teague well enough to discount the information in the report, the DOJ has necessarily created a presumption that Mr. Teague has a criminal record.

¶45  In its discussion of the innocence letters, the DOJ essentially admits that its reports will create at least a presumption of criminality.  In describing the utility of those documents, it says "[y]ou can use this letter to prove to prospective employers or others that the criminal history . . . does not belong to you."  There would be no need to prove such a thing if the DOJ had not first created the presumption of criminality with its report.

¶46  The DOJ does not ameliorate in any meaningful sense the effect of this inaccurate suggestion of criminality by supplying disclaimers along with its imputation of criminal behavior, or by advising requesters that the report may not

---

[26] The DOJ explains that the "master name" in the Database is just the name given by the subject of the record upon first contact with law enforcement——it may not be the person's actual name at all.  So if ATP's first contact with police was his theft of Mr. Teague's identity, the master name on ATP's record in the Database would be "Dennis Teague."

relate to the subject of the request.  Such hedging does not negate the defamation:

> It is true that the letters contained words such as "apparently" and "appear to be."  This changes nothing.  The authorities agree that communications are not made nondefamatory as a matter of law merely because they are phrased as opinions, suspicions or beliefs.  As this court has held:  "One may be libeled by implication and innuendo quite as easily as by direct affirmation."

Converters Equipment Corp., 80 Wis. 2d 257, 263-64, 258 N.W.2d 712 (1977) (quoting Frinzi v. Hanson, 30 Wis. 2d 271, 277, 140 N.W.2d 259 (1966)).  Further, the DOJ provides these disclaimers with all criminal background reports.  They are not keyed to the DOJ's level of confidence in the accuracy of the match between the report and the subject of the request.  Thus, when the DOJ ascribes ATP's criminality to Mr. Teague, it provides the same disclaimers as it would if it were providing ATP's criminal history to someone requesting a Criminal History Search on ATP himself.[27]  That is to say, the disclaimers are unrelated to the specific report the DOJ provides the requester.  It is no wonder the disclaimers simply fade into the background, as one of Mr. Teague's witnesses testified.[28]

---

[27] The same, that is, with the possible exception that the disclaimers accompanying a criminal history report based on ATP's name may not include the "response caveat" addressed in footnote 10.  The DOJ's supplemental letter brief did not indicate whether the "response caveat" disclaimer would appear as a consequence of Mr. Teague's name appearing as an alias in ATP's record.

[28] See supra note 5.

31

¶47 Further, a person requesting a Criminal History Search would quite reasonably interpret the DOJ's disclaimers in the context of its actions. Notwithstanding the caveats, the simple act of supplying a criminal history report in response to a Criminal History Search carries with it an expression of some level of confidence that the report is more than a random compilation of information in the Database. It is a representation that the DOJ believes the report it produces has some relation to the subject of the request. If it believed the report did <u>not</u> relate to Mr. Teague, presumably the DOJ would not produce it. It is not unreasonable for the requester, who may know no more about the subject of the request than the DOJ, and who has no access to the DOJ's search algorithm, to mirror the DOJ's belief.

¶48 The circuit court addressed the defamatory nature of the DOJ reports in a context slightly different from our analysis in its findings of facts and conclusions of law. It appears to have concentrated on the accuracy of the information in the report, without reaching the relationship between what the requester sought and the DOJ provided.[29] In that context, its conclusion was reasonable:

---

[29] The circuit court in its findings of fact and conclusions of law said: "The department can only say that in its database there is at least one occurrence of the first and last name and that a person with whom that occurrence is associated is also linked to an occurrence of the queried date of birth or one close to it."

32

The criminal history responses issued by the Department in response to name-based queries using the plaintiff's names and dates of birth could be much improved but they are not defamatory. They are not literally false and when taken as a whole and fairly and reasonably read do not convey a false and defamatory meaning to their intended audience (the public making a records request).

¶49 However, requesters are not simply asking whether a certain name appears in the Database. They are asking whether the subject of the request has a criminal history. And when the DOJ produces a criminal history that belongs to someone other than the subject of the request, its response is literally false, and can be understood in no other way than to create the presumption that the subject is a criminal, when in fact he is not. Therefore, because the report falsely ascribes criminality to an innocent person, the response conveys a defamatory meaning to the intended audience. To the extent the circuit court's

33

finding of fact is inconsistent with this conclusion, it was clearly erroneous.[30]

### b.   "Stigma Plus"

¶50 Notwithstanding their undeniable intrinsic value, one's good name and reputation do not automatically receive procedural safeguards under the Due Process Clause. Governmental defamation triggers the Due Process Clause only when the defamation also harms a more tangible "liberty" or "property" interest.

¶51 Several decades ago, the United States Supreme Court considered whether a person labeled as a drunkard by her local police department was entitled to some process by which she might challenge the department's actions. Wisconsin v. Constantineau, 400 U.S. 433 (1971). While recognizing that not

---

[30] It is not altogether clear why the dissent believes the criminal history report is not "literally false" when produced in response to a Criminal History Search request on Mr. Teague. Not even the DOJ was willing to take that position. It admitted that "[t]he record DOJ returns in response to a search for 'Dennis Teague' is a report that contains the name as an alias for ATP, but the record itself does not 'pertain[]' to Teague." If the record does not pertain to Mr. Teague, then as a purported criminal history report it cannot be anything but literally false. And yet the dissent says that, having received the literally false report in response to a request for a criminal background check on Mr. Teague, the requester would only "accidentally conclude" that he has a criminal history. Dissent, ¶155. If that is an accidental conclusion, it is the same one made by the DOJ in supplying the literally false report in the first place. The dissent does not explain how the requester might be better equipped than the DOJ——with its trained staff and sophisticated algorithms——to avoid that accident.

all governmental action will implicate the due process clause, the court recognized that "certainly where the State attaches 'a badge of infamy' to the citizen, due process comes into play." Id., 400 U.S. at 437. In such circumstances, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Id. (emphasis added). Such procedural protections lie at the root of the rule of law: "It is significant that most of the provisions of the Bill of Rights are procedural, for it is procedure that marks much of the difference between rule by law and rule by fiat." Id. at 436.

¶52 Constantineau would seem to extend procedural due process protections to a person's reputation. However, within just a few years, the United States Supreme Court read Constantineau as primarily focused on the right affected by the government's defamation, not the defamation itself. Paul, 424 U.S. 693. In Constantineau, the police interfered with Ms. Constantineau's right to purchase alcoholic beverages by posting a notice prohibiting liquor stores from selling such beverages to her. Constantineau, the Paul Court said, required procedural safeguards because of her liberty interest in buying alcohol. Her reputation, alone, did not engage the procedural protections of the Due Process Clause:

> While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not

35

establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

Paul, 424 U.S. at 701. We have followed suit. Weber v. City of Cedarburg, 129 Wis. 2d 57, 73, 384 N.W.2d 333 (1986) (citing Paul, 424 U.S. at 701) ("Reputation by itself is neither liberty nor property within the meaning of the due process clause of the fourteenth amendment. Therefore, injury to reputation alone is not protected by the Constitution.").

¶53 Paul established what has come to be known as the "stigma-plus" test. This doctrine provides that a government-imposed "badge of infamy" must be accompanied by a more tangible interference with a "liberty" or "property" interest before it will implicate the Due Process Clause.

> It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status.

Paul, 424 U.S. at 710-11.

¶54 Not all consequences of government defamation receive consideration in the stigma-plus analysis. Those that are the natural result of a damaged reputation do not count towards the "plus" portion of the test for impaired liberty interests.

36

> [T]he deleterious effects which flow directly from a sullied reputation would normally also be insufficient [to establish damage to a liberty interest]. These would normally include the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation. When the Supreme Court stated in Paul v. Davis that injury to reputation was not by itself a deprivation of a liberty interest, we presume that the Court included the normal repercussions of a poor reputation within that characterization.

Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir. 1994).

¶55 Thus, to establish a procedural due process violation relating to one's reputation, one must demonstrate (1) a stigma created by government action, and (2) "a right or status previously recognized by state law [that] was distinctly altered or extinguished." Paul, 424 U.S. at 711. Mr. Teague has been stigmatized, and remains at risk of further stigmatization, by the DOJ's policy and practice of providing ATP's criminal history to those who request a Criminal History Search on him. Whether Mr. Teague has a good due process claim depends, therefore, on whether the stigma altered or extinguished a right or status founded in state law.

¶56 The rights and statuses that rise to the level of "liberty" interests are not susceptible of exhaustive recitation, or easy definition.[31] "In a Constitution for a free

---

[31] "It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause." Paul v. Davis, 424 U.S. 693, 710 (1976).

37

people, there can be no doubt that the meaning of 'liberty' must be broad indeed." Bd. of Regents v. Roth, 408 U.S. 564, 572 (1972). "Broad" is certainly an apt description, given how the United States Supreme Court once illustrated the liberty protected by the Due Process Clause:

> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.

Meyer v. Nebraska, 262 U.S. 390, 399 (1923).

¶57 Because the DOJ will provide ATP's criminal history in response to, quite literally, anyone in the world who requests a Criminal History Search on Mr. Teague, the full scope of potential harm it creates in doing so is difficult to quantify. Certainly, employment and housing opportunities could be adversely impacted. But beyond the effect of inaccurate criminal history reports on the economic relationships between members of the public, our statutes and regulations either allow or require a Criminal History Search as a condition to accessing many benefits, rights, and opportunities. Thus, for example, a false criminal history report can burden or foreclose rights or opportunities for the following:

- Physicians. Wis. Stat. § 448.980 (criminal background check required by Interstate Medical Licensure Compact);

38

- Applicants for kinship care, kinship care relatives, and long-term kinship care relatives. Wis. Admin. Code. DCF § 58.04 (criminal background check required as condition to providing such services);

- All employees, including contractors, who work at private schools participating in the Special Needs Scholarship Program. Wis. Admin. Code. PI § 49.03 (criminal background check required as condition to providing such services);

- Qualified paraprofessionals in the insurance industry. Wis. Admin. Code. Ins. § 3.36 (criminal background check required as condition to providing such services);

- Anyone working in a "shelter care facility." Wis. Admin. Code. DCF § 59.04 (criminal background check required as condition to providing such services);

- Everyone working at "Mental Health Day Treatment Services for Children." Wis. Admin. Code. DHS § 40.06 (criminal background check required as condition to providing such services);

- All employees at "residential care apartment complexes." Wis. Admin. Code. DHS § 89.23 (criminal background check required as condition to providing such services);

- All volunteers, community resources, contract providers, and members of religious groups who provide religious services at jails. Wis. Admin. Code. DOC §§ 350.31, 350.32 (criminal background check required as condition to providing such services);

- Everyone providing education on DNR-regulated activities, such as operation of all-terrain vehicles, boating, hunting, trapping, snowmobiling, fishing, or aquatics. Wis. Admin. Code. NR § 19.30 (criminal background check required as condition to providing such services).

- Respite foster care providers. Wis. Admin. Code. DCF § 56.21 (criminal background check required as condition to providing such services);

39

- Individuals working in emergency mental health services. Wis. Admin. Code. DHS § 34.21 (criminal background check required as condition to providing such services);

- Child-care workers. Wis. Stat. § 48.685(2)(am)1 (criminal background check required as condition to providing such services);

- Handgun purchasers. Wis. Stat. § 175.35 (criminal background check required as condition to purchasing handgun);

- Applicants for concealed-carry permits. Wis. Stat. § 175.60 (criminal background check required as condition to obtaining the permit);

- State employees whose positions involve fiduciary responsibilities. Wis. Stat. § 230.17 (criminal background check required as condition to obtaining such a position);

- Burglar alarm installers. Wis. Stat. § 134.29 (criminal background checks not required, but permitted);

- Drivers for ride-sharing services such as Uber and Lyft. Wis. Stat. § 440.445 (criminal background check required as condition to providing such services);

- Anyone driving county-provided transportation for seniors and those with disabilities. Wis. Stat. § 85.21 (criminal background check required as condition to providing such services);

- Anyone driving school buses or other transportation provided by school boards, counties, or private schools. Wis. Stats. §§ 121.555 & 343.12 (criminal background check required as condition to providing such services);

- Elevator contractors, mechanics, and inspectors. Wis. Stat. § 101.985 (criminal background check required as condition to providing such services);

40

- Travelling sales crews. Wis. Stat. § 103.34 (criminal background check required as condition to providing such services);

- DOT employees and contractors with access to vehicle or driver's license records. Wis. Admin. Code. Trans. § 195.11 (criminal background check required as condition to obtaining such positions); and

- Anyone having access to the Wisconsin Donor Registry. Wis. Admin. Code. DHS § 137.07 (criminal background check required as condition to obtaining access to database).[32]

¶58 The amount of impairment to one of these rights or statuses necessary to trigger procedural due process protections is easy enough to state: It must be altered or extinguished. Mr. Teague does not claim any such interest has been extinguished, so we may proceed to determining whether Mr. Teague will suffer any alteration of a right or status protected by state law.

¶59 Because one's character and reputation are so important in employment decisions, due process claims frequently arise in that context following a government-imposed stigma. For example, Smith ex rel. Smith v. Siegelman considered the employment implications of the State designating an individual as a child abuser without notice or a hearing. 322 F.3d 1290 (11th Cir. 2003). That court took note of Paul's admonition that a person's reputational interest, "apart from some more tangible interests such as employment," receives no due process

---

[32] In none of these instances is the State agency required to conduct a fingerprint-based, as opposed to a name-based, criminal history inquiry.

protection. Id. at 1296 (quoting Paul, 424 U.S. at 701). The court concluded that even when the government-imposed stigma impacts future employment opportunities, the Due Process Clause calls for no procedural protections. "[D]eleterious effects that flow directly from a sullied reputation, such as the adverse impact on job prospects," the court said, "are normally insufficient." Id. at 1298. In the employment context (at least in the Eleventh Circuit), there is no "plus" unless the stigma causes the actual loss of a job: "We do not think the law of this Circuit has established that defamation occurring other than in the course of dismissal from a job . . . will suffice to constitute a deprivation [of liberty] sufficient to state a claim under section 1983." Von Stein v. Brescher, 904 F.2d 572, 582 (11th Cir. 1990).

¶60 Such a narrow formulation appears to be at odds with the Supreme Court's teaching. In Board of Regents v. Roth, the Court addressed (at least tangentially) whether future employment prospects could present a liberty interest sufficient to engage due process requirements. 408 U.S. 564 (1972). As it turned out, the State had not stigmatized Mr. Roth, but the Court observed that if it had done so, "this would be a different case" because "[t]here might be cases in which a State refused to re-employ a person under such circumstances [such] that interests in liberty would be implicated." Id. at 573. Even Paul itself did not preclude the loss of future employment opportunities from serving as the "plus": "Finally, it is to be noted that this is not a case where government action has

42

operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity." Paul, 424 U.S. at 705-06 (quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 898 (1961)).[33]

¶61 Government-imposed stigmas can also potentially affect liberty interests when the State requires a Criminal History Search as a condition to government benefits, employment, or the exercise of certain rights. Humphries v. County of Los Angeles considered the due process implications of being listed on California's Child Abuse Central Index ("CACI"). 554 F.3d 1170 (9th Cir. 2008) rev'd on other grounds sub nom Los Angeles v. Humphries, 562 U.S. 29 (2010). The Humphries were arrested on charges of child abuse and felony torture, which automatically earned them a listing on the CACI. The charges were later dismissed and, pursuant to two independent tribunals, the Humphries were found to be "factually innocent" of the charges. Notwithstanding these determinations, the California Department of Justice refused to remove the Humphries from the CACI.

¶62 The Humphries court found that being listed on the CACI not only defamed the Humphries, it also altered their

---

[33] See also Zaccagnini v. Morris, 478 F. Supp. 1199, 1202 (D. Mass. 1979) ("The allegation that defendants, without according plaintiff a name-clearing hearing, marked him so as to endanger subsequent employment opportunities states a claim under 42 U.S.C. § 1983 because it alleges that state action, without the opportunity of a hearing, 'imposed on (plaintiff) a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.'" (quoting Paul, 424 U.S. at 709-10)).

43

rights. California's statutes (at least as they existed when the case was decided) required certain state agencies to conduct background searches as a precondition to several rights and opportunities.  For example, such searches were necessary before "gaining approval to care for children in a day care center or home, obtaining a license or employment in child care, volunteering in a crisis nursery, receiving placement or custody of a relative's child, or qualifying as a resource family." Id. at 1187 (citations omitted).  Access to the CACI was also available to state agencies "overseeing employment positions dealing with children, persons making pre-employment investigations for peace officers, child care licensing or employment, adoption, or child placement, individuals in the Court Appointed Special Advocate program conducting background investigations for potential Court Appointed Special Advocates, and out-of-state agencies making foster care or adoptive decisions." Id. at 1188 (citations and internal marks omitted).

¶63 With respect to the measurement of alteration, the Humphries Court observed that termination of a right or status is not necessary to implicate one's liberty interest:  "We recognize that being listed on the CACI may not fully extinguish the Humphries' rights or status." Id.  But one's liberty interests are altered when the state-imposed stigma imposes a "tangible burden on an individual's ability to obtain a right or status recognized by state law . . . ." Id.  The burden Humphries identified was that California's laws "effectively require[] agencies to check a stigmatizing list" and makes the

44

agencies responsible for "drawing independent conclusions regarding the quality of the evidence disclosed." Id. at 1188 (internal marks omitted).

¶64 The Second Circuit Court of Appeals adopted a similar analysis. Valmonte v. Bane, 18 F.3d 992 (2d Cir. 1994). Ms. Valmonte found herself listed on New York's Central Register of Child Abuse and Maltreatment (the "Register") after slapping her daughter for stealing. The child protective proceedings initiated in response to that incident were subsequently dismissed, but because there was "some credible evidence" of mistreatment, the Department of Social Services refused to remove her from the Register. Id. at 995.

¶65 After acknowledging that the natural consequences of a stigmatized reputation do not, by themselves, justify due process protections, Valmonte considered the impact of state law on her ability to obtain future employment in the child-care field. Id. at 1001. Employers in this field must consult the Register before extending offers of employment. Id. If she is in the Register, and the employer still wishes to hire her, it would need to draft and maintain a written explanation of its decision. Id. Inclusion in the Register, therefore, was not an absolute bar to employment, but it imposed a significant functional barrier: "Valmonte is not going to be refused employment because of her reputation; she will be refused employment simply because her inclusion on the list results in an added burden on employers who will therefore be reluctant to hire her." Id. (emphasis added). That consequence, the court

45

said, altered Ms. Valmonte's status enough to implicate her liberty interest: "In this case, we find that the requirement that puts burdens on employers wishing to hire individuals on the list results in a change of that individual's status significant enough to satisfy the 'plus' requirement of the 'stigma plus' test." Id. at 1002.

¶66 The Seventh Circuit Court of Appeals agrees with the Valmonte analysis:

> Today, we are confronted with circumstances very similar to those before the Second Circuit in *Valmonte.* Illinois law requires prospective employers to consult the central register before hiring an individual and to notify [the Illinois Department of Children and Family Services] in writing of its decision to hire a person who has been indicated as a perpetrator of child abuse or neglect.

Dupuy v. Samuels, 397 F.3d 493, 511 (7th Cir. 2005). Inclusion on the register "places, by operation of law, a significant, indeed almost insuperable, impediment on obtaining a position in the entire field of child care." Id. The court reasoned that "the imposition of this added legal impediment constitutes a very tangible loss of employment opportunities due to the

disclosure of the indicated report," thereby altering the individual's status. Id.[34]

¶67 Other states have found that inclusion in a stigma-inducing state database can work a deprivation of liberty interests by burdening the exercise of a person's rights. In North Carolina, the State will add a person to a state-maintained registry (the "RIL") if he is identified as a person responsible for child maltreatment. In re WBM, 690 S.E.2d 41 (N.C. Ct. App. 2010). That list is available to "child caring institutions, child placing agencies, group home facilities, and other providers of foster care, child care, or adoption services that need to determine the fitness of individuals to care for or adopt children." Id. at 43. The court concluded that "inclusion on the RIL deprives an individual of the liberty interests guaranteed under our State Constitution by inhibiting the individual from using his faculties to adopt, foster, and care for children, earning his livelihood in the childcare field, or pursuing or securing employment in the childcare field." Id. at 49; see also, Cavarretta v. Dep't of Children &

---

[34] The Court ultimately ruled against the plaintiffs because, it said, foster parenting (the plaintiffs' chosen field) is not a "career" such that it can give rise to a liberty interest. Depuy v. Samuels, 397 F.3d 493, 514-15 (7th Cir. 2005). See also, Behrens v. Regler, 422 F.3d 1255 (11th Cir. 2005) (holding that plaintiff, who was listed as a "verified" child abuser on a state registry, and so experienced an added burden in trying to adopt a child, did not suffer an impairment of a liberty interest because not even those who are not on the list are guaranteed the ability to adopt a child under Florida law).

Family Servs., 660 N.E.2d 250, 254 (Ill. App. Ct. 1996) ("[B]eing placed on the State register of suspected child abusers implicates a Federal liberty interest.  A subject of an 'indicated' report may be prohibited from working in certain professions, such as child care and teaching." (internal citations omitted)).

### c.  Mr. Teague's "plus"

¶68 We adopt the Humphries/Valmonte/Dupuy analysis and hold that, because the stigma caused by the DOJ's Criminal History Search report imposes a tangible burden on Mr. Teague's ability to obtain or exercise a variety of rights and opportunities recognized by state law, he has suffered an alteration of status within the meaning of Paul v. Davis, and so has been deprived of a liberty interest.

¶69 The DOJ's background check predictably and consistently provides ATP's criminal history to people requesting a Criminal History Search on Mr. Teague.  This is an entirely unwarranted defamation of someone with no criminal history at all.  But the injury Mr. Teague (and those similarly situated) suffers does not end there.  Wisconsin's statutory and regulatory framework mean that the defamation now stands between Mr. Teague and the acquisition or exercise of any of a number of opportunities or rights.

¶70 Because of the defamation caused by the DOJ's Criminal History Search report, Mr. Teague will experience a tangible burden should he wish to work for, e.g., the State of Wisconsin (in any position of fiduciary responsibility), the Department of

48

Transportation (should he need access to vehicle or driver's license records), a company in the insurance industry (as a paraprofessional), a shelter care facility, a facility providing mental health day treatment services for children, a school participating in the Special Needs Scholarship Program, a residential care apartment complex, an emergency mental health service, an elevator company, a child-care company, or a ride-sharing company like Uber or Lyft.  He suffers a state-imposed tangible burden if he wishes to install burglar alarms, drive school buses, work in a travelling sales crew, become licensed as a physician in Wisconsin, have access to the Wisconsin Donor Registry, purchase a handgun, or obtain a concealed-carry permit.  He cannot, without laboring under the additional burden created by the state-imposed stigma, provide kinship care, respite foster care, religious services at jails, transportation to seniors and those with disabilities, or education on DNR-regulated activities such as fishing, hunting, trapping, boating, or snowmobiling.

¶71  Mr. Teague finds himself in a position no Wisconsin citizen ought to occupy.  He and the DOJ both know the DOJ's Criminal History Search report is going to defame him.  Worse, he does not know when and where it will happen, just that it will.  So Mr. Teague must constantly monitor his government's activity in hopes he will catch each time the Criminal History Search suggests he is a criminal.  Worse yet, he can never be certain he has caught them all.  He also knows that even when he espies a defamation, it means spending his time and resources

49

trying to convince the person to whom he was defamed that he is not really a criminal.

¶72 The stigma created by the DOJ's Criminal History Search report has altered Mr. Teague's status, and so has deprived him of a liberty interest protected by the Fourteenth Amendment to the United States Constitution. This conclusion is consistent with Paul, and does not implicate its concern that every government agent's defamatory comment will give rise to a due process claim. We address here a policy and practice that consistently and predictably calumnizes innocent people, and operates as a burden on their state-based rights. Mr. Teague is entitled to due process in connection with this policy and practice.[35]

---

[35] The dissent says this case presents a dispute we should leave to the legislature to settle: "I depart from Justice Kelly's writing, however, because the legislature is the body to weigh and consider the need for public access to this information with the fact that some innocent bystanders might be wronged by such access." Dissent, ¶151. While we must be careful not to intrude on the legislature's prerogatives, we must be equally careful not to cede our own. When an executive agent of the state takes action that violates the statutory or constitutional rights of "innocent bystanders," we do not leave it to the legislature to "weigh and consider" that injury against "the need for public access to this information." To do so would be to abjure our core judicial function. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Mr. Teague brought us a quintessential question of law, and it belongs nowhere else.

## 2. Process due

¶73 The second step in our due process analysis is determining whether the process available to Mr. Teague is adequate when compared to the deprivation of his liberty interest. "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (internal marks and citations omitted). To determine what procedural protections are due Mr. Teague, we consider three factors:

> First, the private interest that will be affected by the official action;
>
> [S]econd, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and
>
> [F]inally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 335.

¶74 We see two potential sources of procedural safeguards currently available to Mr. Teague. The first is the opportunity to challenge the accuracy of the criminal history reports under the auspices of Wis. Stat. § 19.70. We determined, supra, that this statute provides an avenue to correct these reports. However, it appears this procedure may provide only incomplete

51

relief. Mr. Teague is still left in the position of cleaning up defamations after they occur, and then only when they happen to come to his attention.

¶75 The second potential procedural safeguard, the availability of an "innocence letter," is little better (at least as far as we can discern from the record). This gives Mr. Teague a useful tool with which to counteract the DOJ's official suggestion that he is a criminal. But the DOJ does not include Mr. Teague's innocence letter with ATP's criminal history when it responds to a Criminal History Search on Mr. Teague. So Mr. Teague must still monitor and track each instance in which a Criminal History Search report defames him so that he may discover to whom he must forward the innocence letter.[36]

¶76 Further, his innocence letter has an unknowable shelf-life. The letter warrants he is conviction-free as of a date certain. But if ATP should commit another crime after that date, Mr. Teague would need a new innocence letter. So not only must Mr. Teague track the DOJ's Criminal History Search so he knows each time he is defamed, he must also track ATP so he

---

[36] The DOJ's new red-font "response caveat" makes for a slightly more muscular disclaimer, but it is still just a disclaimer. It is likely to have only marginally more impact on those who do not take the time to read the rest of the lengthy disclaimers the DOJ had already been providing. Nor does it relieve Mr. Teague from the burden of having to monitor the DOJ and ATP so that he can determine when, and to whom, he must provide positive evidence that he is not the criminal suggested by the criminal history report.

knows when he must, once again, prove to his government that he is not a criminal so that he may counter the defamation.

¶77 Finally, there is this. We must not forget that Mr. Teague finds himself where he is because he is the victim of a crime. His cousin stole his identity. And because of the way the DOJ compiles and disseminates criminal history reports, it keeps that injury alive day after day without end, even after determining that ATP's criminal history has nothing to do with Mr. Teague.

¶78 Based on the record before us, we conclude that the Mathews factors indicate the Wis. Stat. § 19.70 and "innocence letter" procedures are inadequate safeguards for Mr. Teague's liberty interest. The DOJ has an admittedly important and legitimate interest in making its records available to the public. But it chose this method of doing so because it is "quicker, cheaper, and easier than fingerprint-based searches . . . ." As Mr. Teague demonstrates, however, quick, cheap, and easy can be a recipe for unending governmental defamations.

### C. Remaining Arguments

#### 1. Petitioners' Arguments

¶79 Mr. Teague presented a common-law challenge to the DOJ's criminal background-check program, as well as constitutional challenges founded on the Equal Protection Clause and the so-called "substantive" component of the Due Process Clause. Because we were able to resolve this case without reference to those arguments, we will not address them. See,

53

e.g., Hull v. State Farm Mut. Auto. Ins. Co., 222 Wis. 2d 627, 640 n.7, 586 N.W.2d 863 (1998) ("As a general rule, when our resolution of one issue disposes of a case, we will not address additional issues.").

### 2. Pre-Production Judicial Review

¶80 The DOJ argues that Wis. Stat. § 19.356[37] bars the part of Mr. Teague's claim alleging the DOJ failed to apply the "common law balancing test" before providing ATP's criminal history report to those who requested a background check on Mr. Teague. It did not assert that bar with respect to Mr. Teague's claims pursuant to Wis. Stat. § 19.70 or our constitutions. Therefore, because we do not address the "common law balancing test," we need not consider the applicability of this statute.

### V. CONCLUSION

¶81 The DOJ's Criminal History Search reports violate Mr. Teague's rights, and he is to be afforded prospective relief sufficient to protect those rights. The record is not sufficiently developed for us to determine the form that relief

---

[37] This statute provides that:

> Except as authorized in this section or as otherwise provided by statute, no authority is required to notify a record subject prior to providing to a requester access to a record containing information pertaining to that record subject, and no person is entitled to judicial review of the decision of an authority to provide a requester with access to a record.

Wis. Stat. § 19.356(1).

should take, so we remand to the circuit court for that purpose.[38]

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court for further proceedings not inconsistent with this opinion.[39]

---

[38] The dissent, perhaps inadvertently, leaves the impression that our conclusion may be, in part, some form of judicial catharsis:  "The entire court feels sorry for Teague and those like him," dissent, ¶150; "I can join these members of the court in their pitying Teague for what ATP did to him and the injustice that could occur if improper assumptions are made as to Teague," id., ¶151; " Members of the court are not wrong to wish that there was a remedy for Teague," id., ¶164.  It is the court's duty to set aside its "wishes," and emotions, and instead render a true decision based on law and fact.  We have done that.  The law, not desire, commands relief for Mr. Teague.

[39]   With respect to the violation of Mr. Teague's rights, six justices agree Mr. Teague's criminal history report is inaccurate and in need of correction under Wis. Stat. § 19.70. See supra, ¶34 (joined by Justice Rebecca Grassl Bradley); Justice Abrahamson's writing, ¶¶115-16 (joined by Justice Ann Walsh Bradley); Justice Gableman's concurrence, ¶138 (joined by Chief Justice Roggensack).   One justice, Justice Ziegler, writing in dissent, concludes (1) that the circuit court was not clearly erroneous in stating that "'criminal history responses . . . are not literally false and . . . do not convey a false and defamatory meaning . . . .'" and (2) that "the information in the database is correct."  Dissent, ¶¶160, 164.

With respect to the remedy for the violation of Mr. Teague's rights, six justices conclude the court of appeals must be reversed and that Mr. Teague is entitled to prospective relief sufficient to protect his rights:

> This opinion (joined by Justice Rebecca G. Bradley) would remand to the circuit court to determine, based on the Mathews trilogy of considerations, what manner of procedural safeguards are sufficient to satisfy Mr. Teague's right to due process of law.

(continued)

55

Justice Shirley S. Abrahamson (joined by Justice Ann Walsh Bradley) concludes that the supreme court should issue a declaratory judgment that the Department of Justice "must comply with the mandatory requirements of § 19.70 and must hereafter issue correct criminal history records pertaining to these petitioners," that the Department of Justice is enjoined "from refusing to comply with the mandatory requirements of § 19.70," and that "the petitioners may seek further supplementary relief in the Dane County Circuit Court based on the declaratory judgment 'whenever necessary or proper' pursuant to § 806.04(8)." Justice Abrahamson's writing, ¶¶87, 88, and 90.

Justice Michael J. Gableman (joined by Chief Justice Patience D. Roggensack) concludes:  "In Teague's case, if the action DOJ ultimately takes to correct the criminal history reports under § 19.70 is insufficient to remedy Teague's injury, then Teague may seek judicial review under Wis. Stat. § 227.52. . . .   [R]esolving Teague's statutory claim under Wis. Stat. § 19.70 is sufficient to resolve this appeal."  Justice Gableman's concurrence, ¶¶143, 144.

There are, therefore, four votes to remand this matter to the circuit court to develop prospective relief sufficient to safeguard the petitioners' rights (Justices Patience Drake Roggensack, Michael J. Gableman, Rebecca Grassl Bradley, and Daniel Kelly).  Four justices conclude that the petitioners are entitled to prospective relief based on the violation of Wis. Stat. § 19.70, and that the relief should be sufficient to prevent the release of inaccurate criminal history reports to those who inquire about the petitioners (Justices Shirley S. Abrahamson, Ann Walsh Bradley, Patience Drake Roggensack, and Michael J. Gableman).

No proposed <u>form</u> of remedy garnered a majority of the justices' votes, but neither has a majority of the court foreclosed any particular form of remedy.  On remand, therefore, the circuit court will conduct further proceedings to determine the nature and extent of prospective relief that will be sufficient to protect the petitioners' rights under Wis. Stat. § 19.70.

¶82  SHIRLEY S. ABRAHAMSON, J.[1]  The Department of Justice released a lengthy criminal history record for each of the three petitioners, Dennis Teague, Linda Colvin, and Curtis Williams, in response to public criminal history search requests.  The

---

[1] Finally, in the last footnote of his opinion, Justice Kelly points out the schisms on the court in the instant case and their effect.

My separate writing would end the cause in this court.  I do not remand the cause to the circuit court for further proceedings.  I am not certain from the writings that four justices indisputably conclude that the matter is to be remanded to the circuit court at this time.

Because the court has not always been careful in the past to explain the separate writings in a case and the effect thereof, incorrect references have been made to the first opinion as a lead opinion or to a majority opinion.  Indeed, in State v. Lynch, 2016 WI 66, 371 Wis. 2d 1, 885 N.W.2d 89, the first opinion (that was referenced as the lead opinion) was a dissent.  For an explanation of the term "lead opinion," see State v. Weber, 2016 WI 96, ¶83 n.1, 372 Wis. 2d 202, 887 N.W.2d 554 (Ann Walsh Bradley, J., dissenting).

Because the court has been significantly divided in recent months and has issued numerous separate writings, we should be very careful in each case to explain the effect of the separate writings.  For an analysis of this court's split decisions from 1996 to present, see Professor Alan Ball, A Spike in Fractured Decisions, SCOWstats (May 30, 2017), http://www.scowstats.com/2017/05/30/a-spike-in-fractured-decisions/.  See also Professor Alan Ball, Wisconsin Supreme Court Statistics, 2015-16: Decisions Arranged by Vote Split, SCOWstats (July 22, 2016), http://www.scowstats.com/wp-content/uploads/2016/07/Decisions-by-Vote-Split-2015-16.pdf.

1

Department of Justice concedes, however, that none of the petitioners has a criminal record.[2]

¶83 Nevertheless, the Department of Justice repeatedly characterizes the criminal history records pertaining to the petitioners as accurate. This characterization is baseless, as Justice Kelly's writing explains. See Justice Kelly's writing, ¶¶30-35.[3]

¶84 The Department of Justice repeatedly refuses to make amends. The three petitioners have come to court seeking forward-looking relief. They present a number of different legal claims, and each claim may lead to a different form of relief.

¶85 The relief that Justice Kelly's writing grants is a remand to the circuit court for further judicial proceedings under the petitioners' procedural due process claim.

---

[2] Each petitioner's name probably came up because the individual with a criminal history used some form of the petitioner's name as an alias. This case involves what is known as an alias search. See Justice Kelly's writing, ¶12. The information the Department of Justice provides a requester when the Department uses the alias search may be unreliable, "something the [Department] readily admits." See Justice Kelly's writing, ¶7.

[3] I agree with Justice Kelly's writing that we must treat the Department as having issued inaccurate criminal history records pertaining to the petitioners. Any attempt voiced by the Department to avoid this conclusion is unacceptable. Only one conclusion is acceptable: The Department has been knowingly releasing inaccurate criminal history records containing personally identifiable information pertaining to the petitioners.

¶86 I would grant the petitioners forward-looking prospective equitable remedy relief under Wis. Stat. § 19.70.[4]

¶87 I would have this court issue a declaratory judgment pursuant to Wis. Stat. § 806.04, the Uniform Declaratory Judgments Act. The declaratory judgment would be affirmative in form and effect, declaring that the Department of Justice must comply with the mandatory requirements of § 19.70 and must hereafter issue correct criminal history records pertaining to these petitioners. See Wis. Stat. § 806.04(1).

¶88 The declaratory judgment would also be negative in form and effect. It would include an injunction forbidding the Department from refusing to comply with the mandatory requirements of § 19.70. See Wis. Stat. § 806.04(1).

¶89 There are numerous ways that the Department of Justice can comply with such a declaratory judgment. The means of compliance are initially for the Department to determine. The legislature has delegated the creation and administration of the criminal history database to the Department, and the Department has the expertise and institutional capacity to comply with the

---

[4] Judge Blanchard's writing in the court of appeals denying the petitioners relief under Wis. Stat. § 19.70 was based on the conclusion that the petitioners' request was a request to correct or supplement the database. I agree with Justice Kelly's writing that the petitioners' request was a request to correct the criminal history record, not the database.

Judge Higginbotham and Judge Sherman, writing in the court of appeals, concluded that the relief the petitioners seek under Wis. Stat. § 19.70 is unavailable because the petitioners' argument under § 19.70 for declaratory and injunctive relief was undeveloped in the court of appeals.

declaratory judgment and do justice for these petitioners. Such a declaratory judgment enables the Department to work not only with its staff and database experts but also with the petitioners, requesters of criminal history records, and members of the public interested in technology and privacy to devise solutions.[5]

¶90 If the Department's efforts to correct the inaccuracies in the petitioners' criminal history records fall short, the petitioners may seek further supplementary relief in the Dane County Circuit Court based on this court's declaratory judgment "whenever necessary or proper," pursuant to § 806.04(8).[6]

¶91 The Department of Justice's refusal to acknowledge that it is releasing inaccurate criminal history records

_____

[5] The Department's difficulty with issuing accurate criminal history records apparently results from the algorithm employed by the criminal history database. Justice Kelly's writing, ¶6. The use of algorithms in the criminal justice system is being debated. See State v. Loomis, 2016 WI 68, 371 Wis. 2d 235, 881 N.W.2d 749, petition for cert. filed sub nom. Loomis v. Wisconsin, No. 16-6387, 2017WL855946 (Mar. 6, 2017); Jason Tashea, Calculating Crime: Attorneys Are Challenging the Use of Algorithms to Help Determine Bail, Sentencing and Parole Decisions, ABA Journal, Mar. 2017, at 54.

[6] Wisconsin Stat. § 19.356(1), barring individuals from seeking "judicial review," has been referenced and debated by the parties. I do not read this provision as barring judicial relief under § 19.70 regarding correcting or augmenting an inaccurate criminal history record to which a requester is being given access. Nothing about Wis. Stat. § 19.356 or § 19.70 leads a reader to examine § 19.356(1) in interpreting and applying § 19.70. See Justice Kelly's discussion of § 19.356(1) at ¶80.

pertaining to the three petitioners and that it is required to comply with Wis. Stat. § 19.70 stirs a sense of outrage. This sense is evident in Judge Sherman's concurring opinion in the court of appeals, in which he wrote: "[T]he only response of [the Department of Justice] is that it will continue to [release inaccurate records] because there is no law that compels it to do otherwise. In essence, <u>we are doing this to you because we can</u>. That is the response of a bully and not an appropriate response of the government of a democracy."[7]

¶92 I shall first set forth the relevant statutes applicable to the instant case. I will then interpret and apply Wis. Stat. § 19.70 to the three petitioners. I conclude that the Department has a judicially enforceable duty to correct the criminal history records pertaining to the petitioners under Wis. Stat. § 19.70. Lastly, I will consider other issues raised by the Department of Justice's alias search policy, the release of inaccurate criminal history records, and the plight of individuals who may unknowingly be harmed by release to the public of inaccurate criminal history records pertaining to them.

I

¶93 I first set forth the relevant statutes applicable to the facts in the instant case. The most important statutes to my analysis are Wis. Stat. § 19.70 and the Open Records Law,

---

[7] <u>Teague v. Van Hollen</u>, 2016 WI App 20, ¶85, 367 Wis. 2d 547, 877 N.W.2d 379 (Sherman, J., concurring) (emphasis in original).

5

§§ 19.32-.39. I also briefly summarize the statutes authorizing the Department of Justice to compile, retain, and release criminal history records to the public for a fee, to provide context.

¶94 I begin with **Wis. Stat. § 19.70.**[8] This statute is part of Wis. Stat. §§ 19.62-.80, which make up subchapter IV, entitled "Personal Information Practices," of Chapter 19, entitled "General Duties of Public Officials."

¶95 Section 19.70 informs my analysis because it requires the Department to correct inaccuracies in records containing personally identifiable information.

¶96 When a challenge is made to the accuracy of a record containing personally identifiable information, Wis. Stat. § 19.70, using the word "shall," <u>requires</u> the Department of Justice to take the following action:

- It shall concur with the record subject's challenge and correct the information (§ 19.70(1)(a)); or
- It shall deny the challenge, notify the record subject of the reasons for denying the challenge, and allow the record subject to file a concise statement setting

---

[8] Wisconsin Stat. § 19.70 was previously numbered § 19.365 and was part of subchapter II, entitled "Public Records and Property" (the Open Records Law), of Chapter 19. It was recently renumbered § 19.70 and became part of subchapter IV, entitled "Personal Information Practices," of Chapter 19. <u>See</u> 2013 Wis. Act 71.

6

forth the individual's disagreement with the disputed portion of the record (§ 19.70(1)(b)).[9]

¶97 Section 19.70 thus provides the means for correcting an inaccurate criminal history record containing personally identifiable information released by the Department of Justice.

¶98 Section 19.70 must be read in connection with Wis. Stat. §§ 19.62-.80, the other provisions in subchapter IV, entitled "Personal Information Practices," of Chapter 19.

¶99 Section 19.62(5) defines "personally identifiable information."[10] The criminal history records in the instant case indisputably contain personally identifiable information relating to the three petitioners.[11]

¶100 Section 19.67(1)(b) provides that when the Department of Justice "maintains personally identifiable information that may result in an adverse determination about any individual's rights, benefits or privileges[, the Department] shall, to the greatest extent practicable . . . [v]erify the information . . . ."

---

[9] For the text of Wis. Stat. § 19.70, see Justice Kelly's writing, ¶21.

[10] This same definition is used in the open records law. See Wis. Stat. § 19.32(1r).

[11] The Department's brief asserts that the criminal history records it released in response to requests seeking the criminal history records of the petitioners do not pertain to the three petitioners. See Brief and Supplemental Appendix of Defendants-Respondents at 41. I agree with Justice Kelly's writing at ¶29 that because the records list the petitioners' names, they contain personally identifiable information pertaining to the petitioners.

¶101 I now turn to **Wis. Stat. §19.35.** This section also resides in Chapter 19 but is in subchapter II, which is entitled "Public Records and Property" and is popularly known as the Open Records Law. Section 19.35 is referenced in § 19.70.

¶102 Section 19.70 grants an individual (empowered under § 19.35 (1)(a) and (am) of the Open Records Law to inspect any record containing the individual's personally identifiable information) the right to challenge the accuracy of a record containing personally identifiable information pertaining to the individual.[12] The petitioners fall within § 19.70's reference to § 19.35.

¶103 Finally, I turn to **Wis. Stat. §§ 165.82 and 165.83,** within Chapter 165, entitled "Department of Justice."

¶104 Wisconsin Stat. § 165.83 directs the Department of Justice to maintain a criminal history database. The statute dates back to 1971 and has been amended several times. Law enforcement officers across the state are to provide information to the Department of Justice for the maintenance of the database.

¶105 The criminal history database is maintained for law enforcement and non-law enforcement purposes. With regard to the latter purposes, various state entities are directed by

---

[12] Section 19.62 in "Personal Information Practices" explicitly incorporates the definition of "authority" and "records" that appear in § 19.32 of the Open Records Law. See Justice Kelley's writing, ¶28 (discussing § 19.62). The Department of Justice is an authority under Wis. Stat. §§ 19.32(1) and 19.62(1).

statute or regulation to consult criminal background information on persons who apply for permits, licenses, or employment. See Justice Kelly's writing, ¶57. Some statutes direct persons to the Department of Justice for a criminal background investigation;[13] others do not.[14]

¶106 Criminal history records compiled under Chapter 165 are made available to the public under the Open Records Law (which I discuss further below). Fees charged to acquire criminal history records under the Open Records Law are governed by Wis. Stat. § 165.82, which was enacted in 1987. This statute provides that, in lieu of the fee imposed in Wis. Stat. § 19.35(3) (imposed on those who receive open records upon request), the Department of Justice shall impose a fee for criminal history searches for purposes unrelated to criminal justice according to the following fee schedule: $7 for each name-based record check; $15 for each fingerprint-based record check; and a $5 surcharge if the person requests a paper copy of the results of a criminal history requested.[15]

¶107 Implicit in the directive under Wis. Stat. § 165.83 to the Department to maintain the criminal history database and authority under § 165.82 to charge the public for access to this

---

[13] See, e.g., Wis. Stat. § 101.985(4).

[14] See, e.g., Wis. Stat. § 440.445(1)(b).

[15] In 2015-16, the Department of Justice received $7,280,700 in fees collected under Wis. Stat. § 165.82. See Wisconsin Legislative Fiscal Bureau, Informational Paper 58: State Criminal Justice Functions at 10 (Jan. 2017).

9

database and criminal history records derived therefrom is a need for accuracy. If the need for accuracy did not exist, why would the legislature require the Department to maintain the database and charge users for access?

¶108 In sum, the statutes evidence a relationship between the criminal history database, criminal history records derived therefrom, personal information practices, and the Open Records Law. The statutes provide that the Department of Justice releases criminal history records that are compiled under chapter 165 of the Statutes, containing personally identifiable information governed by §§ 19.62-.80, reasoning that they are "records" subject to the Open Records Law.

II

¶109 With this background of applicable, relevant statutory provisions in mind, I interpret and apply Wis. Stat. § 19.70, the key statute governing the rights of the petitioners. This statute has not been interpreted by this court or the court of appeals prior to the instant case. Thus the instant case is one of first impression.

¶110 The three petitioners complied with the Department's existing process for a record subject to challenge the accuracy of a criminal history record. The process is described on the Department of Justice's website.[16] After each petitioner

---

[16] See Wisconsin Department of Justice, Background Check & Criminal History Information, https://www.doj.state.wi.us/dles/cib/background-check-criminal-history-information.

submitted his or her fingerprints, the Department confirmed that each petitioner had no criminal record and issued an "innocence letter" to each petitioner.[17]

¶111 Nevertheless, the Department's position is that it will continue to adhere to its alias search policy; that it will release a criminal history record for each petitioner each time it runs a new background check on the petitioner; that it will not include in the criminal history record the "innocence letter" or any correction or supplementary information provided by a petitioner; and that it need not and will not inform the requester that the real Teague, Colvin, and Williams have no criminal history.[18]

---

[17] During the pendency of this litigation, the Department of Justice has developed what is, in essence, a "new and improved" innocence letter——the Wisconsin Unique Personal Identification Number (WiUPIN). The Department gives a WiUPIN to individuals who have successfully challenged the accuracy of an entry in the Department's criminal history database. Once an individual receives a WiUPIN, the individual may furnish the WiUPIN to whatever organization intends to request a criminal background check on the individual. If the requester includes the WiUPIN, it "will be used in searching potential matching records, so that any arrest and/or conviction record successfully challenged will not be included in a public response." The WiUPIN is available to individuals who have a name similar to a criminal's or have had their name used by a criminal during an arrest. See Wisconsin Department of Justice, Background Check & Criminal History Information, https://www.doj.state.wi.us/dles/cib/background-check-criminal-history-information.

[18] The Department relies on its disclaimers to warn the requester that the record subject may be innocent of any criminal violation. I agree with Justice Kelly's writing that the disclaimers are ineffectual and insufficient safeguards in the instant case. See Justice Kelly's writing, ¶¶45-46.

11

¶112 The statutes envision that accurate personally identifiable information will be collected, retained, and released by the Department. As explained previously, see ¶¶96-97, supra, Wis. Stat. § 19.70 provides a means for providing accurate personally identifiable information.

¶113 When a challenge is made to the accuracy of a record containing personally identifiable information, Wis. Stat. § 19.70, using the word "shall," requires the Department of Justice to take the following action:

- It shall concur with the record subject's challenge and correct the information (§ 19.70(1)(a)); or

- It shall deny the challenge, notify the record subject of the reasons for denying the challenge, and allow the record subject to file a concise statement setting forth the individual's disagreement with the disputed portion of the record (§ 19.70(1)(b)).

¶114 Indeed, it appears that in future responses to records requests about these three petitioners, the Department can repair the inaccurate criminal history records with very little difficulty or expense.

¶115 Still, the Department has, in effect, refused to comply with Wis. Stat. § 19.70 even though it is fully aware of the inaccuracies in criminal history records pertaining to these petitioners. Indeed, the Department, even in this court, has not explained why it cannot and will not repair any inaccurate criminal history records it releases in the future pertaining to the petitioners.

12

¶116 I conclude, as does Justice Kelly's writing, that the petitioners have successfully demonstrated that Wis. Stat. § 19.70 entitles them to have the inaccuracies corrected in the criminal history records the Department releases in the future. See Justice Kelly's writing, ¶35.

¶117 As I stated previously, I write separately because I disagree with Justice Kelly's writing that relief under Wis. Stat. § 19.70 "will likely never have anything more than a retroactive effect." See Justice Kelly's writing, ¶35.

¶118 In contrast, I conclude that a prospective equitable remedy is available to the three petitioners under Wis. Stat. § 19.70. Section 19.70 would be an ineffective, worthless provision unless each of the three petitioners had a remedy under the statute when the Department violated the statute.

¶119 The legislature could not have intended that the Department could violate Wis. Stat. § 19.70 with no consequences. Implicit in § 19.70 is the concept that if the Department does not comply with § 19.70, a court may declare rights under the statute and enjoin the Department from violating the statute.

¶120 As I explained previously, I would have this court issue a declaratory judgment pursuant to Wis. Stat. § 806.04, the Uniform Declaratory Judgments Act. The declaratory judgment would be affirmative in form and effect, declaring that the Department of Justice must comply with the mandatory requirements of § 19.70. See Wis. Stat. § 806.04(1).

13

¶121 The declaratory judgment would also be negative in form and effect enjoining the Department from refusing to comply with the mandatory requirements of Wis. Stat. § 19.70. See Wis. Stat. § 806.04(1).

¶122 To obtain injunctive relief, a party must generally show: (1) sufficient probability that future conduct will violate a right and cause injury; (2) that the injury will be irreparable; and (3) that no adequate remedy exists at law for the injury.[19]

¶123 The requirements for injunctive relief are satisfied in the instant case. First, there is a sufficient probability that the Department will not change its conduct of its own accord to correct the inaccuracies that have harmed the petitioners. The petitioners' woes will begin anew whenever the Department releases criminal history records pertaining to these petitioners. The petitioners' names, absent the injunctive relief that I conclude this court should order, will continue to be inaccurately associated with a criminal history.

¶124 Second, the injury to the petitioners is irreparable. Every time the Department releases an inaccurate criminal history record, "it is inaccurately suggesting that the [record subject] has a criminal history when, in fact, he does not." See Justice Kelly's writing, ¶43. The imposition of such a "specter of criminality" damages the individual's reputation and increases the odds that the individual will lose innumerable

---

[19] See Pure Milk Prods. Co-op. v. Nat'l Farmers Org., 90 Wis. 2d 781, 280 N.W.2d 691 (1979).

14

opportunities.  See Justice Kelly's writing, ¶43.  Such an injury has the likelihood of being extremely widespread.  The "Wisconsin Criminal History Single Name Record Request" form imposes no limits on who may request a criminal background record, and anyone in the "General Public" may request a background check for "General Information."[20]  In 2015, the Department processed about 900,000 "public criminal background check requests."  The potential for widespread injury cannot readily be rectified.

¶125 Third, no adequate remedy exists at law.  Money damages for past or future injury would not curtail the Department's future violations of Wis. Stat. § 19.70 or remedy the injury.  Only injunctive relief will prevent the Department from hereafter releasing inaccurate criminal history records pertaining to the petitioners.

¶126 In sum, I would have this court issue a declaratory judgment as I have described.

III

¶127 I briefly discuss other issues raised by the Department of Justice's alias search policy, the release of inaccurate criminal history records, and the plight of individuals who may unknowingly be harmed by release to the

---

[20] This form and instructions are available on the Department of Justice's website, https://www.doj.state.wi.us/sites/default/files/dles/cib-forms/record-check-unit/DJ-LE-250-single.pdf.

15

public of inaccurate criminal history records pertaining to them.

¶128 The relief that I would have the court grant in the instant case would be precedent and would be available to all individuals similarly situated to the petitioners. But not all individuals affected by release of criminal history records will be situated similarly to the petitioners.

¶129 In the instant case, the three petitioners were aware of the release of inaccurate criminal history records pertaining to them, obtained innocence letters, and requested the Department to correct criminal history records released pertaining to them.

¶130 Many individuals, however, may not be aware that they are the victims of the Department of Justice's release of inaccurate criminal history records. These individuals have no opportunity to obtain an innocence letter or to challenge inaccurate criminal history records released to requesters searching their names and birthdates.[21] These individuals would not fall within the relief granted in the instant case.

¶131 Neither Wis. Stat. § 19.70, an innocence letter, nor the Wisconsin Unique Personal Identification Number (WiUPIN), each of which puts the onus on the record subject to challenge

---

[21] The Department requires a name and birthdate to comply with a request for a criminal history record. Although the requester for Teague's criminal history record inaccurately advised the Department of Teague's birth date, the Department nevertheless released the records using Teague as an alias because the Department uses a range of acceptable birthdates.

the criminal history record, aids an individual who does not know of the inaccurate criminal history record pertaining to him or her.

¶132 A challenge may very well arise in the future to the Department of Justice's alias search policy in compiling and releasing criminal history records. There is a significant likelihood that as a result of this policy the Department will release an inaccurate criminal history record pertaining to an individual without giving the record subject an opportunity to correct or supplement the record.

¶133 The interpretation and application of the statutes relating to the criminal history database, criminal history records, and personally identifiable information may benefit from further attention by the Department of Justice. Further legislative attention may also be needed. See Wis. Stat. § 13.92(2)(j).

¶134 For the reasons set forth, I write separately.

¶135 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

¶136 MICHAEL J. GABLEMAN, J.   (concurring).   I agree with the lead opinion that the criminal history reports that are at issue in this case are inaccurate as a matter of law under Wis. Stat. § 19.70.   I further agree that DOJ is required to correct the inaccurate information.   I therefore join part of the lead opinion[1] and concur in the mandate of the court.   I part ways with the lead opinion, however, to the extent that it also purports to resolve the petitioners' constitutional claims, and for that reason I write separately.

¶137 Wisconsin Stat. § 19.70 provides that a person may challenge, in writing, the accuracy of a public record maintained by a government authority when that document contains personally identifiable information pertaining to that person. Wis. Stat. § 19.70(1).   In response to a challenge under § 19.70, the authority must make a decision: it shall either "correct the information" if it concurs with the challenge, or it shall issue a written denial if it denies the challenge. § 19.70(1)(a)-(b).   If it denies the challenge, it shall also afford the challenger an opportunity to file a concise written statement setting forth the challenger's reasons for disputing the accuracy of the record.  § 19.70(1)(b).

¶138 The lead opinion concludes, and I agree, that "the record at issue in this case is the report created in response

---

[1] More specifically, I join Parts I, II, III, IV.A, IV.C, and V of the lead opinion, but I do not join Part IV.B or the last two sentences of Part IV.A.   I also note that I agree with footnote 39 in the lead opinion, describing the effect that this court's mandate should have on remand to the circuit court.

1

to a request for a Criminal History Search," lead op., ¶25, and that Wis. Stat. § 19.70 applies to the reports because they contain personally identifiable information pertaining to Teague and the other petitioners, id., ¶¶28-29. I further agree that, because "DOJ has known ATP's criminal history report does not relate to Mr. Teague ever since it issued Mr. Teague's innocence letter . . . by continuing to produce that report in response to an inquiry into whether Mr. Teague has a criminal history, [DOJ] is providing inaccurate information." Id., ¶34. Not only has this inaccuracy occurred in past reports, but it will continue to recur unless DOJ makes corrections. "The inaccuracy arises when the DOJ provides that report to someone asking whether Mr. Teague has a criminal history. It is the DOJ itself that is affirmatively creating the inaccuracy, and Mr. Teague has successfully demonstrated that Wis. Stat. § 19.70 entitles him to have this inaccuracy corrected." Id., ¶35.

¶139 However, I do not conclude, as the lead opinion does, that "corrections under § 19.70 will likely never have anything more than a retroactive effect." Id. Rather, I interpret Wis. Stat. § 19.70(1)(a) to require that, at a minimum, DOJ must make corrections sufficient to prevent the same inaccuracy from recurring the next time someone requests Teague's criminal history report. Complying with § 19.70(1)(a) requires "correct[ing] the information," and in Teague's case, DOJ is providing inaccurate information by incorrectly presenting ATP's criminal history as Teague's when, in fact, DOJ knows that Teague has no criminal history. Merely retracting a single

2

report amounts to no correction at all, because the database will continue to generate the same report with the same inaccuracies. Therefore, under the facts here——where DOJ knows its database is repeatedly producing the same inaccuracy——I conclude that "correct[ing] the information" under § 19.70(1)(a) requires ensuring that ATP's criminal history will no longer be inaccurately reported as Teague's. I agree with Justice Abrahamson that § 19.70 "would be an ineffective, worthless provision" if Teague did not have a remedy under the statute. Justice Abrahamson's opinion, ¶118.

¶140 Holding that Teague and the other petitioners are entitled to this remedy under Wis. Stat. § 19.70 is enough to resolve this appeal.[2] Consequently, there is no need to address the constitutional arguments presented. It is well established that we construe statutes to avoid constitutional infirmities. "A court should avoid interpreting a statute in such a way that would render it unconstitutional when a reasonable interpretation exists that would render the legislation constitutional." Am. Family Mut. Ins. v. DOR, 222 Wis. 2d 650, 667, 586 N.W.2d 872 (1998). Similarly, "[t]his court has frequently concluded that it need not address a claim of constitutional error if the claim can be resolved on statutory

---

[2] DOJ argues that Wis. Stat. § 19.70 has no application to this case because the petitioners never challenged the "accuracy" of any record. I join a majority of justices in rejecting that argument, and I conclude that § 19.70 entitles the petitioners to have the inaccuracies corrected. In my opinion, the task of crafting an appropriate order is best left to the circuit court.

3

or common law grounds." State v. Dyess, 124 Wis. 2d 525, 533, 370 N.W.2d 222 (1985); see State v. Bobby G., 2007 WI 77, ¶3, 301 Wis. 2d 531, 734 N.W.2d 81 ("Because we can resolve the case on statutory grounds, we decline to address the constitutional issues presented . . . .").

¶141 Nevertheless, despite its holding that Wis. Stat. § 19.70 "entitles [Teague] to have this inaccuracy corrected," lead op., ¶35, the lead opinion concludes that the § 19.70 "procedures are inadequate safeguards for Mr. Teague's liberty interest," id., ¶78. The lead opinion speculates that "it appears this procedure may provide only incomplete relief." Id., ¶74. This speculation is an inadequate basis upon which to resolve matters of constitutional magnitude.

¶142 If the lead opinion's speculation turns out to be correct, the statutes already provide an avenue for relief. Petitioners may seek judicial review of DOJ's final decision under Wis. Stat. § 19.70. I conclude——and DOJ acknowledged at oral argument——that chapter 227 of the statutes permits judicial review of § 19.70 decisions. Chapter 227 provides for judicial review of "[a]dministrative decisions which adversely affect the substantial interests of any person, whether by action or inaction, whether affirmative or negative in form." Wis. Stat. § 227.52. If DOJ's final decision under § 19.70 adversely affects Teague's "substantial interests," then § 227.52 applies and Teague would have standing if he could "demonstrate both that [he] sustained [an] alleged injury due to the agency decision, and that the injury is to an interest which the law

recognizes or seeks to regulate or protect." Waste Mgmt. of Wis., Inc. v. DNR, 144 Wis. 2d 499, 505, 424 N.W.2d 685 (1988).

¶143 Here, the interest protected by Wis. Stat. § 19.70 is the interest in having inaccurate information corrected. As the lead opinion aptly describes it, § 19.70 provides a process by which the subject of a public record "may, upon discovering an inaccuracy in that record, engage a statutory mechanism to have it corrected." Lead op., ¶21. This mechanism requires DOJ to respond to the challenge by issuing a decision and either concurring with the challenge or denying the challenge. See § 19.70(1)(a)-(b). In Teague's case, if the action DOJ ultimately takes to correct the criminal history reports under § 19.70 is insufficient to remedy Teague's injury, then Teague may seek judicial review under Wis. Stat. § 227.52.

¶144 Because the statutes provide the petitioners with a remedy, I see no need to decide the constitutional issues presented. Accordingly, I join Parts I, II, III, IV.A, IV.C, and V of the lead opinion, but I do not join Part IV.B or the last two sentences of Part IV.A. I write separately to explain my view that resolving Teague's statutory claim under Wis. Stat. § 19.70 is sufficient to resolve this appeal.

¶145 For the foregoing reasons, I respectfully concur.

¶146 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.

¶147 ANNETTE KINGSLAND ZIEGLER, J.   *(dissenting).*   No one disputes, for purposes of this appeal, that Dennis Teague's ("Teague") cousin, ATP, used the name "Dennis Antonio Teague" as an alias and that ATP, not Teague, has a criminal history.   As to ATP, then, the Wisconsin Department of Justice's ("DOJ") criminal history database is absolutely correct.   The database reflects that ATP used the name "Dennis Antonio Teague" as an alias.   The database correctly reflects dates of birth not shared by Teague, an image that is not Teague's image, ATP's name as well as the alias names attributed to him, and ATP's criminal history.   It is important, and seemingly accurate, to have that information available in the database as concerns ATP. The only common information between ATP and Teague is the name.

¶148 The problem occurs when Teague's name is searched, even with Teague's own date of birth (which is different than ATP's date of birth); ATP's record (with dates of birth attributed to ATP) appears, and ATP's record reflects that he used the name "Dennis Antonio Teague" as an alias.   Teague wants this court to remedy the wrong that occurs to him when people might question whether it is he who has the criminal history. Teague is not without recourse.   Teague and some members of this court want more.   I do not blame them, but I cannot join this constitutional journey in search of a remedy, particularly when other relief has been made available, but is, according to Teague, unsatisfactory.   The court leaves the circuit court with no guidance regarding an appropriate remedy.   In addition, the

issue of remedy might even be rendered moot given the DOJ's implementation of a new search system.

¶149 In reporting accurate facts as to ATP in its criminal history database, the DOJ provides a valuable service to those employers, businesses, and members of the general public who may want to know more about ATP or the alias he may be using at the moment. It is valuable information, for example, if ATP is posing to be Teague with ATP's date of birth, for those who search to be able to know that ATP, posing as Teague, has this criminal history. And if Teague were trying to prove that ATP has used his name as an alias, he would want that information to be available as well. The information in the database is not illegitimate.

¶150 The difficulty arises under these facts because Teague wants his good name to reflect just that. He apparently is not presently in need of proving that ATP has in fact used his name as an alias. In fact, if he found himself in that position, he would presumably want to use the database as proof that ATP has used his good name as an alias. While this database reflects accurate information as to ATP's alias, it is less than clear as to Teague's lack of criminal history, particularly if one does not heed the warnings in the database. In other words, if not read thoroughly, as the database warns to do, it could cause some to question whether Teague might have a criminal history. Teague finds unsatisfactory that those who are aggrieved by the results of a database search may obtain relief in the form of an official letter to demonstrate that it is not they who possess a

2

criminal record. Teague did, in fact, receive such a letter but he nonetheless fears that it is not enough to exculpate him in the eyes of others. I feel sorry for him and for those who find themselves in his position. The entire court feels sorry for Teague and those like him.

¶151 I depart from Justice Kelly's writing,[1] however, because the legislature is the body to weigh and consider the need for public access to this information with the fact that some innocent bystanders might be wronged by such access. Our own court has repeatedly faced similar difficult challenges to our own website by those who have been wronged by the information that is available. Our court has not seen fit to create the kind of remedies for those individuals that certain members of the court would create for Teague today. I can join these members of the court in their pitying Teague for what ATP did to him and the injustice that could occur if improper assumptions are made as to Teague. I, however, cannot join Justice Kelly's writing with its construction of a constitutional violation where none exists in order to avoid a bad outcome and its conclusion that the DOJ's publication of truthful, valuable information as to ATP deprives Teague of liberty under the state and federal constitutions.

¶152 As a preliminary, but fundamental, legal matter, the circuit court below, acting as factfinder, found that the "criminal history responses issued by the [DOJ] in response to

---

[1] Given the votes of my colleagues, I refer to the writing's author specifically in order to provide clarity.

3

name-based queries using the plaintiff[s'] names and dates of birth . . . are not literally false and when taken as a whole and fairly and reasonably read do not convey a false and defamatory meaning to their intended audience."[2]  We owe deference to that determination.  Unlike Justice Kelly's writing, I am unable to conclude that the circuit court's finding is clearly erroneous.  Without such a conclusion, Teague's procedural due process claim fails from the outset.  Accordingly, I respectfully dissent.[3]

---

[2] Although the term "defamation" has been used in Justice Kelly's writing, I note that the term has a unique definition under the law.  See, e.g., Wis JI-Civil 2500.  Although I will use this terminology, I do not necessarily mean to conclude that this is indeed a defamation claim.

[3] Like Justice Kelly's writing and the court of appeals, I address only Teague's circumstances, not those of the intervening plaintiffs.  While the petitioners do not face identical scenarios, the reasoning in this writing applies equally to each of them.  For instance, the criminal history report of the individual who apparently stole petitioner L.C.'s name lists a birth date that in fact corresponds to L.C.'s birth date.  But numerous other aspects of the criminal history report make clear that the report does not belong to L.C.

In addition to Teague's procedural due process claim, Justice Kelly's writing also discusses the application of Wis. Stat. § 19.70 to this case.  However, the writing ultimately appears to reject this statute as the primary avenue of relief. The circuit court below concluded both that Teague could not challenge the information in the database because it pertained to ATP rather than Teague and that even if the criminal history report at issue is a record, it is not kept by the authority and thus is "not a record that Teague can challenge or with which his challenge can be filed."  The court of appeals below rejected the matter as undeveloped.  See Teague v. Van Hollen, 2016 WI App 20, ¶¶71-76, 367 Wis. 2d 547, 877 N.W.2d 379 (Higginbotham, J., concurring); id., ¶79 (Sherman, J., concurring).

(continued)

4

I

¶153 "Procedural due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Wisconsin Constitution protect[s] against government actions that deprive an individual of life, liberty, or property without due process of the law." Adams v. Northland Equip. Co., 2014 WI 79, ¶64, 356 Wis. 2d 529, 850 N.W.2d 272. The procedural due process claim in this case requires the court to "determine first whether there exists a liberty interest of which [Teague] has been deprived, and if so, whether the procedures used to deprive that liberty interest were constitutionally sufficient." State v. Alger, 2015 WI 3, ¶39 n.15, 360 Wis. 2d 193, 858 N.W.2d 346 (quoting State v. West, 2011 WI 83, ¶83, 336 Wis. 2d 578, 800 N.W.2d 929).

¶154 Also as a fundamental legal principle, "A plaintiff may prove a deprivation of a liberty interest by showing damage to her 'good name, reputation, honor, or integrity,' Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971), but any stigmatic harm must take concrete forms and extend beyond mere reputational interests." Omosegbon v. Wells, 335 F.3d 668, 675 (7th Cir. 2003) (citing Paul v. Davis, 424 U.S. 693, 711-12 (1976)). Put differently, "[e]ssentially, a plaintiff claiming a deprivation based on defamation by the government must

---

Even my colleagues who would grant relief under Wis. Stat. § 19.70 do not agree on what that relief should be and who should provide it. As a result, I need not address the issue. I also decline to address the other claims Teague has raised.

establish the fact of the defamation 'plus' the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause." Cannon v. City of West Palm Beach, 250 F.3d 1299, 1302 (11th Cir. 2001) (citing Paul, 424 U.S. at 701-02). In this case it is unnecessary to inquire into the existence of damage to "some more tangible interest" possessed by Teague because Teague has not even established the fact of reputational injury. I cannot ignore this important and jugular deficit.

¶155 I recognize that with regard to the issue of reputational injury, there is in fact little to be gained in attempting to refute much of the reasoning in Justice Kelly's writing. Justice Kelly's writing may be quite right that if one ignores certain purposes a requester might have for entering Teague's information into the criminal history database, ignores the DOJ's thorough explanation, in the reports it provides, of the information it is actually providing, ignores details demonstrating that the record returned in response to a request is not Teague's own record (such as a name, image, and/or birthdate that do not correspond to Teague's own name, image, and/or birthdate), and instead focuses entirely, blinders on, upon the single fact that a name corresponding to Teague's own name appears somewhere in the criminal history report provided, then one might indeed accidentally conclude that Teague possesses a criminal history.

¶156 But that, obviously, is not how these criminal history reports are to be analyzed. See, e.g., Leuch v. Berger, 161

6

Wis. 564, 571, 155 N.W. 148 (1915) ("The words used must be construed in the plain and popular sense in which they would naturally be understood. And the words claimed to be libelous must be read in the light of the entire article." (citation omitted)). Begin with the requester's purpose. In one entirely conceivable scenario, a requester receives personal information from an individual and wishes to verify, through the criminal history database, whether that individual possesses a criminal history. If the individual is, for example, ATP using information stolen from Teague, the criminal history database will accurately notify the requester that the name the requester received has been used as an alias by the individual. The criminal history database has served its purpose.

¶157 Under other circumstances, the individual who provided the personal information will be the individual himself——Teague, for example. But despite this eventuality, and for understandable public protection reasons, the DOJ may wish to maintain in its database the fact that ATP stole Teague's name. The DOJ therefore fully and carefully explains the nature of the results it provides to requesters. The following are just a few excerpts of the explanation the DOJ provides that are directly relevant to the facts of this case (emphases are in the original):

> IMPORTANT EXPLANATION ABOUT HOW TO UNDERSTAND THIS RESPONSE
>
> . . . .
>
> Read these sections carefully to understand how this response relates to the identifying data you provided.

7

. . . .

<u>You must carefully read the entire Wisconsin criminal
history record below in order to determine whether the
record pertains to the person in whom you are
interested.</u>

<u>Do not just assume that the criminal history record
below pertains to the person in whom you are
interested.</u>

. . . .

<u>It is not uncommon for criminal offenders to use alias
or fraudulent names and false dates of birth,
sometimes known as "identity theft."</u>

If the name you submitted to be searched is <u>DIFFERENT</u>
from the "Master Name" [a term defined elsewhere]
below, the Wisconsin criminal history record below may
belong to someone other than the person whose name and
other identifying data you submitted for searching.
If an alias or fraudulent name used by the person who
is the "Master Name" is similar to the name you
submitted for searching, that does not mean that the
person whose name you submitted for search has a
criminal history.  It means that the person associated
by fingerprints with the Wisconsin criminal history
below has used a name similar to the name you
submitted for searching.

. . . .

<u>To determine whether the Wisconsin criminal history
below actually belongs to the person whose name and
other identifying information you submitted for
searching,</u> compare the information reported below to
the other information you have obtained about that
person.   Inconsistencies may indicate that the
criminal history reported below does not belong to the
person whose name and other identifying information
you submitted for searching.

¶158 This is not "legalese."  It is clear, unembellished
English.  And if a requester entering Teague's information reads
and follows these unambiguous instructions, that person will
know, for instance, to "compare the information reported" in

8

ATP's criminal history "to the other information" the requester has "obtained about" Teague. The person will discover inconsistent names, birthdates, and perhaps even images. The criminal history database may not have proven very helpful to the requester, but it should not have harmed Teague.

¶159 In sum, it is a bit of an overstatement to conclude, in light of the foregoing, that the DOJ's "policy and practice . . . consistently and predictably calumnizes innocent people." Justice Kelly's writing, ¶73. In fact, that conclusion is not really one for members of this court to make because first, we are not a fact-finding court and second, the factfinder below reached the opposite conclusion. In other words, one might argue that despite the explanation the DOJ provides, and even considering the context in which a criminal history report is requested, a requester may still read one of the DOJ's criminal history reports to ascribe a criminal background to an individual who does not possess one. This is precisely why the question of the defamatory nature or not of the criminal history reports at issue was submitted to a factfinder below.

¶160 Specifically, the circuit court concluded, in its findings of fact, that the "criminal history responses issued by the [DOJ] in response to name-based queries using the plaintiff[s'] names and dates of birth . . . are not literally false and when taken as a whole and fairly and reasonably read do not convey a false and defamatory meaning to their intended audience." That finding is not clearly erroneous, and Teague's

9

procedural due process claim therefore fails. The DOJ has not defamed Teague. It reports, for the benefit of the public and others, the truthful (for purpose of this appeal) fact that ATP has used the name "Dennis Antonio Teague" as an alias. At bottom, the analysis in Justice Kelly's writing rests on fears that requesters are either unable or unwilling to follow the basic instructions the DOJ gives them in the reports it provides. However, the factfinder considered this possibility and rejected it. I would not upset the circuit court's findings. Moreover, Justice Kelly's writing leaves the circuit court to create a remedy and provides it with no guidance whatsoever as to what that might be. Additionally, the other litigants have separate concerns but Justice Kelly's writing similarly provides the circuit court with absolutely no guidance as to what their remedies may be. The DOJ has referenced a new system that will be or has now been implemented. Perhaps that will provide the process that members of this court now believe is due.

II

¶161 This case is all the more concerning because of how it may be used in the future. Justice Kelly's writing casts doubt on the validity of a host of government-run databases similar to the one at issue here. A good example is the Wisconsin Circuit Court Access ("WCCA") system, a database that "provides access to certain public records of the Wisconsin circuit courts."[4] One

---

[4] Wisconsin Circuit Court Access, https://wcca.wicourts.gov (last visited March 19, 2017).

need provide only a name to gain access to court-related information potentially associated with that name, including records of criminal convictions.

¶162 This court has been less than receptive to requests of individuals who have claimed to be victimized by the way WCCA information is maintained. The court has fallen far short of finding a due process violation. On June 30, 2009, the Board of Governors of the State Bar of Wisconsin submitted a petition to modify the Supreme Court Rules, explaining:

> As this Court is aware, [WCCA] can be reviewed by anyone with internet access and the information contained on the website is regularly misused. [WCCA] publishes the original criminal case information regardless of the outcome of the case. . . . To allow continued access to such easily misunderstood information, especially in cases in which the case was dismissed or there was a judgment of acquittal, poses the risk that such a record could be "a vehicle for improper purposes," whether intentional or not.

In re Petition of the State Bar of Wisconsin to Modify Chapter 72 of the Supreme Court Rules, Petition 09-07 at 11-12 (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978)), https://www.wicourts.gov/supreme/docs/0907petition.pdf. Although the court's own website has produced its own victims, the court does not even provide a letter as relief to those aggrieved. On July 19, 2016, this court dismissed the petition. S. Ct. Order 09-07 (issued Jul. 19, 2016), https://www.wicourts.gov/sc/rulhear/DisplayDocument.pdf?content=pdf&seqNo=172234.

¶163 It seems, then, that members of this court are holding the DOJ to a stricter standard when it comes to the maintenance

11

of the type of information at issue than it does the Wisconsin Court System.   One wonders how WCCA, and other databases like it, might fare given the constitutional relief Justice Kelly's writing seeks to provide today.

                                III

¶164 Members of the court are not wrong to wish that there was a remedy for Teague that could address all possible scenarios, but Justice Kelly's writing unfortunately errs in concluding that the DOJ unconstitutionally deprived Teague of liberty.   I would uphold the finding of the circuit court below and conclude that Teague has not established that the DOJ defamed him.   The information in the database is correct.   It is unfortunate that Teague's name has been used as an alias. Nonetheless, Teague's procedural due process claim must fail. This court should not insert itself further into a dispute that is best resolved, if need be, by the legislature.

¶165 For the foregoing reasons, I respectfully dissent.

                                12